Submitted on the briefs April 10, considered and under advisement May 7; Oregon Laws 2019, chapter 545, declared valid September 3, 2020

## CITY OF DAMASCUS,
### James B. De Young, Jeanne Robinson, Mark Fitz, and William Wehr,
*Petitioners,*

*v.*

## STATE OF OREGON,
### by and through Kate Brown, Governor; and Bev Clarno, Secretary of State,
*Respondents.*

### (SC S066939)

472 P3d 741

After an attempt to disincorporate the City of Damascus under the voter-initiated process requiring the approval of an absolute majority of the city's electors, as provided in ORS 221.610 and ORS 221.621, failed, the 2015 Legislative Assembly enacted House Bill (HB) 3085 (2015), which referred a disincorporation measure—Measure 93—to the city's voters, to be voted on in an election requiring only a majority of those voting. Measure 93 passed, and a member of the city council challenged the election on the ground that the disincorporation requirements set out in ORS 221.610 and ORS 221.621 had not been followed. His challenge failed in the circuit court, but three years later, the Court of Appeals reversed, holding that HB 3085 (2015) had not exempted the 2016 election from ORS 221.610 and ORS 221.621 and that, because the election had not been held in accordance with those statutes, it was invalid. *De Young v. Brown*, 297 Or App 35, 443 P3d 642 (2019). By that time the city had effectively disincorporated; local governments that had filled the void left by the disincorporation asked the legislature to fix the problem. The legislature thereafter enacted Senate Bill (SB) 226 (2019) (Oregon Laws 2019, chapter 545, sections 1 to 5), which purported to give effect to the 2016 vote by the city's residents to disincorporate. SB 226 provided two alternative mechanisms by which the vote would be made effective and provided for direct and expedited review by the Oregon Supreme Court. Petitioners challenged SB 226 on various constitutional and statutory grounds. *Held*: One of the two alternative mechanisms provided in SB 226 for giving effect to the 2016 election is not unlawful under any of the theories that petitioners present; that mechanism—set out in sections 2 and 3 of the statute—therefore, had the intended effect of validating the 2016 election.

Oregon Laws 2019, chapter 545, is declared valid.

En Banc

On petition for review under Oregon Laws 2019, chapter 545, section 4.

Edward H. Trompke, Jordan Ramis PC, Lake Oswego, and Tyler D. Smith, Tyler Smith & Associates PC, Canby, filed the briefs for petitioners City of Damascus, James B. De Young, Jeanne Robinson, Mike Fitz, and William Wehr.

Philip Thoennes, Assistant Attorney General, Salem, filed the brief for respondents. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

BALMER, J.

Oregon Laws 2019, chapter 545, is declared valid.

**BALMER, J.**

In Senate Bill (SB) 226 (2019), enacted as Oregon Laws 2019, chapter 545, sections 1 to 5, the Oregon legislature sought to retroactively cure defects in a 2016 local election in which voters approved disincorporating the City of Damascus (the city). Anticipating controversy as to the validity and effectiveness of SB 226 in curing the problem with the election, the legislature included a provision for direct and expedited review by this court upon a timely petition filed by any person who is "interested in or affected or aggrieved" by the statute. Petitioners here, who include at least one person who is "interested in or affected or aggrieved" within the meaning of the statute, have challenged SB 226 on various statutory and constitutional grounds in a timely filed petition. Having considered petitioners' arguments and the state's responses, we now conclude that SB 226 is valid and that it accomplishes what the legislature intended, *i.e.*, it gives effect to the 2016 vote by the city's residents to disincorporate.

## I.   BACKGROUND

We draw the following history from the parties' stipulated facts. The City of Damascus was incorporated in 2004, after some area residents became convinced that incorporation would give them more control over land use decisions that would have to be made after the area was included in Portland Metro's urban growth boundary. Shortly thereafter, in 2005, the city's residents adopted a charter, which gave the city home rule authority. By 2013, however, some city residents had become dissatisfied with the city's performance in various respects and began a campaign to disincorporate it. Ultimately, the question of disincorporation was referred to the voters in accordance with the procedure for disincorporation provided by state law, ORS 221.621. Pursuant to that statute, electors filed an initiative petition with the city seeking a vote on disincorporation, and the issue appeared on the ballot in the next November election.[1]

---

[1]  ORS 221.621 provides:

"(1) This section establishes the procedure for determining whether a city shall disincorporate. The question shall be decided by election. The

The disincorporation proposal failed. Although it was approved by a majority of those voting on the measure, it was not approved by "a majority of the electors of the city" as required by the applicable statute, ORS 221.610.[2]

In 2015, a group of residents sought the legislature's help in obtaining another vote on disincorporation, under less stringent rules. The legislature obliged, enacting House Bill (HB) 3085 (2015), which referred to residents another disincorporation measure. Section 1(2) of HB 3085 provided that, "notwithstanding ORS 221.610 and 222.621," if the vote was in favor of disincorporation, on a specified day "following the date of the election held pursuant to section 2 of this 2015 Act," the city would surrender its charter and cease to exist (along with other acts necessary for disincorporation). Section 2 provided, "This 2015 Act shall be submitted to the people of the City of Damascus for their approval or rejection, by a majority of the voters voting on this 2015 Act, at a special election held on the same date as the next primary election."[3] HB 3085 was submitted to the people of Damascus

---

governing body of the city shall call an election when a petition is filed as provided in this section.

"(2) The requirements for preparing, circulating and filing a petition and calling an election under this section shall be as provided for an initiative measure under ORS 250.265 to 250.346, except that notwithstanding ORS 250.325, the governing body of the city shall not consider adoption or rejection of the measure before submitting it to the electors.

"(3) Notwithstanding subsection (2) of this section, if ORS 250.255 makes ORS 250.265 to 250.346 inapplicable to a city, the requirements for preparing, circulating and filing a petition under this section shall be as provided for an initiative petition under the city charter or an ordinance adopted under the city charter.

"(4) The question of disincorporation shall be submitted to the electors of the city at an election held on the first Tuesday after the first Monday in November in any year but shall not be submitted more than once in two consecutive calendar years."

[2] ORS 221.610 provides:

"Any city not liable for any debt or other obligation, may surrender its charter, disincorporate and cease to exist if a majority of the electors of the city authorize the surrender and disincorporation as provided in ORS 221.621 and 221.650. The surrender and disincorporation shall become effective 60 days after the city has authorized surrender and disincorporation."

[3] HB 3085 thus attempted to exempt the contemplated disincorporation vote from the stricter standards of ORS 221.610 and ORS 221.621. Notably, however, it was enacted as a referral, not as a law. It was not signed by the Governor—a necessary step for an enactment to become law (unless it is a referred measure—in

as Measure 93 in the May 2016 election and was approved by a majority of the voters who voted on the issue.

A resident who was a member of the city council challenged the disincorporation vote, arguing that Measure 93 had been placed on the ballot in violation of the city charter, ORS 221.610 and ORS 221.621, and the Oregon Constitution. The Clackamas County Circuit court rejected that challenge, and the plaintiff appealed. By the time the appeal was heard, however, the city had performed all the acts that finalized its disincorporation: It had paid all its debts and transferred its remaining funds and real and personal property to Clackamas County, "surrendered" its charter, and deposited its records in the office of the Clackamas County Clerk. ORS 221.650. To further complicate matters, the neighboring city of Happy Valley by that time had annexed various parcels of property that had been within the city's boundaries, at the request of the property owners. When the plaintiff's appeal finally was set to be heard, the state suggested to the Court of Appeals that, because those acts of disincorporation and annexation could not be undone and any decision on the appeal therefore would have no practical effect, the case should be dismissed as moot. The Court of Appeals rejected the state's mootness argument and held, on the merits, that the Measure 93 election had been invalid. *De Young v. Brown*, 297 Or App 355, 443 P3d 642 (2019), *rev allowed*, 366 Or 292 (2020).

The plaintiff's initial statutory argument in *De Young* focused on the fact that the 2016 disincorporation election had not complied with the requirements for disincorporation set out in ORS 221.610 and ORS 221.621, to which the state responded that HB 3085 had exempted the election from those requirements by enacting an alternative mechanism for disincorporation, with different requirements, including a referral by the state legislature, a vote on the referred measure in the next primary (May) election, and a "yes" vote by a majority of the voters voting on the referred measure. The Court of Appeals rejected the state's

which case the measure becomes law when it is approved by the people in an election held in accordance with the applicable law). *See* Or Const, Art IV, § 1(3)(c) (bills ordering a referendum and bills on which a referendum is ordered not subject to veto by governor).

positions, however, explaining that HB 3085 had not, in fact, exempted the disincorporation election from the requirements in ORS 221.610 and ORS 221.621:

> "[A]t the time of the Measure 93 election, ORS 221.610 and ORS 221.621 provided the only means by which a city could disincorporate *and [ ] the legislature did not effectively exempt the election from complying with their terms.* Moreover, defendants do not dispute that, if the Measure 93 election was required to comply with those terms, it failed to do so[.]"

*Id.* at 370 (emphasis added). The court further explained:

> "The only provision, legislative or otherwise, for a special election at which a simple majority would prevail is that found in the substantive text of HB 3085, text that defendants acknowledge cannot have been given effect until after the election it purported to authorize. To our knowledge, the legislature did not, at the time it passed HB 3085, also issue an order dictating the manner in which its provisions would be submitted to a vote."

*Id.* at 369. Having thus invalidated the election on statutory grounds, the court declined to consider the plaintiff's other arguments. *Id.* at 358.

The Court of Appeals decision in *De Young* threw the local governments that had filled the void left by the city's disincorporation into a state of confusion. Clackamas County, which had absorbed most of the city's employees into its own workforce along with the city's funds, lobbied for a legislative fix. Attorneys for Clackamas County and other affected governments (Happy Valley and Portland Metro) worked closely with legislators to draft a bill that would validate and make effective the outcome of the 2016 disincorporation election. The resulting bill, SB 226, which is the subject of our present review, was enacted by the legislature and then signed by the Governor on July 15, 2019. It became effective immediately thereafter.

SB 226 consists of four sections and provides two alternative mechanisms for ratifying the results of the 2016 disincorporation election. Section 1 provides the first alternative. It declares that "notwithstanding ORS 221.610, 221.621, and 221.650, a city shall be deemed to be

disincorporated and shall cease to exist * * * upon a determination by the Secretary of State" that (among other things) a disincorporation election was held in the city between January 1 and July 1, 2016, in which the majority of those voting had voted in favor of disincorporation.

Sections 2 and 3 of SB 226, taken together, provide another means of ratifying the 2016 election. Section 2 provides an alternative procedure for disincorporating a city to the one provided in ORS 221.610 and ORS 221.621—a legislative referral of the disincorporation question to the city's residents, with disincorporation occurring upon a vote of a majority of those voting on the question in the first "primary" (May) election following the referral.[4] That was the procedure set out in HB 3085 and followed in the 2016 disincorporation election. Section 3 provides that "Section 2 of this 2019 Act applies to Acts enacted or referred, and elections held, *before the effective date of this 2019 Act*." (Emphasis added.) In other words, section 3 makes the new statutory procedure for disincorporating a city set out in section 2 retroactive, meaning that it would apply to the 2016 disincorporation election that the Court of Appeals had invalidated in *De Young*.

Finally, section 4(1) of SB 226 states the intent of the legislature in passing the law:

"It is the intent of the Legislative Assembly by enacting sections 1 to 3 of this 2019 Act to cure any defect in the procedures, and to ratify the results of any vote on the question of the disincorporation of a city in which the disincorporation was approved by a majority of the voters of the city voting on the question at an election held on the date of a primary election held throughout this state before the effective date of this 2019 Act."

---

[4] Specifically, section 2 provides, in part:

"(1) Notwithstanding ORS 221.610, 221.621 and 221.650:

"(a) The Legislative Assembly may refer an Act to the people of a city on the question of whether to disincorporate the city.

"(b) If the Legislative Assembly refers an Act under this section:

"(A) The election on the measure shall be held on the date of the next primary election held throughout this state that occurs after the enactment of the referred Act; and

"(B) The measure shall be approved if a majority of the voters voting on the question in the election votes in favor of disincorporation."

Section 4 also provides for expedited review by this court of the validity of sections 1 through 3 upon a petition for review filed within 30 days following enactment, by a person "interested or affected or aggrieved" by those sections, and it sets out detailed instructions for such review. Among other things, section 4(5) instructs the court to first determine whether section 1 of SB 226 is valid and to proceed to determine the validity of sections 2 and 3 if, and only if, it determines that section 1 is not valid.

Petitioners, at least one of whom meets the statute's standing requirement, timely filed a petition for review.[5] Petitioners argue that SB 226 violates various provisions of the Oregon Constitution: home rule (Article IV, section 1(5); Article XI, section 2), separation of powers (Article III, section 1), and an "implied or inherent" constitutional prohibition on retroactively applicable election rules. They also argue that SB 226 violates certain Oregon statutes and the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution.

## II.   ANALYSIS

Of the numerous constitutional and statutory flaws in SB 226 that petitioners assert, only some require extended discussion, and we focus on those. As noted, section 4(5) of SB 226 directs this court to determine the validity of section 1 before considering sections 2 and 3, and to consider the latter sections only if we first determine that section 1 is invalid. We consider in greater detail below whether we must or should follow that legislative directive; however, that directive is not relevant to most of petitioners' arguments, which apply equally to section 1 and to sections 2 and 3 (combined), and for that reason we consider those arguments first.

### A.   *Wrongful Delegation*

Petitioners contend that there was a fundamental problem in the 2016 disincorporation election that precludes any ratification of its results by SB 226. In particular,

---

[5] The state acknowledges (and we agree) that, as a taxpayer and elector of the city that SB 226 purported to disincorporate, petitioner James B. De Young is "interested in or affected or aggrieved" within the meaning of section 4(3)(a).

petitioners assert that, in referring Measure 93 to the voters of Damascus, the legislature purported to delegate to those voters a decision that the legislature had no authority to make—the decision to repeal the city's charter. To support that assertion, petitioners point to Article XI, section 2, of the Oregon Constitution, which grants the legal voters of every city and town the power to enact and amend their own municipal charters and directs that the Legislative Assembly *"shall not* enact, amend, or *repeal any charter or act of incorporation* for any municipality, city or town."* (Emphases added.) Petitioners argue that, because the legislature lacked authority, under Article XI, section 2, to repeal the city's charter, its attempted delegation of the issue to the city's voters in Measure 93 could not have been effective. Furthermore, petitioners argue, the city's voters did not *themselves* have authority to repeal the charter, because Article XI, section 2, provides the legal voters of a city with power to only "enact and amend" their own municipal charter—not power to repeal it. Thus, petitioners conclude, given that the voters of Damascus had neither power of their own nor delegated power from the legislature to repeal their city charter, the outcome of the Measure 93 election on that issue was a nullity, which could not be cured by the enactment of SB 226.

Petitioners appear to be confusing the continued existence of a city with the continued existence of its charter, and disincorporation with the charter's repeal. But the two circumstances are distinct. In fact, while Article XI, section 2, *authorizes* the voters of a city to enact a charter, it does not *require* them to do so ("The legal voters of every city and town are hereby *granted power to enact and amend their municipal charter"*). Neither is there any requirement that a city's charter be "repealed" for the city to disincorporate. Instead, a city "surrender[s]" its charter *after* a vote to disincorporate, ORS 221.650—assuming that it has a charter to surrender. Thus, the Measure 93 vote on whether to *disincorporate* the City of Damascus did not conflict with the authorities pertaining to municipal charters that are conveyed or withheld in Article XI, section 2. And the voters of the city clearly had authority to decide whether to disincorporate the city, as is evidenced by ORS 221.610 and ORS

221.621, the statutory provisions setting out requirements for elections on the issue, the validity of which petitioners do not question. There was no need for a delegation of authority from the legislature to the city's voters to make that decision.

B. *Implied Prohibition on Retroactive Amendments to Elections Laws*

Petitioners contend that the Oregon Constitution contains an implied or inherent prohibition against retroactive changes to election rules that change the outcome of an election and that SB 226 violates that prohibition because it "purports to change the outcome of the election on Measure 93 some three years after the election was held, by substantively changing the kind of majority needed." Petitioners suggest that this court can and should find that such a rule inheres in the Oregon Constitution because it is "widely held" that changing the rules governing a past election so as to change the result would be lawless.

As an initial matter, we reject petitioner's characterization of the effect of SB 226 as changing the applicable rules for the election after the fact. The Measure 93 election was held under the rules set out in Measure 93 itself—it was held during a primary election, with the understanding that the measure would pass and disincorporation result if it received the votes of the majority of those who actually voted. While the Court of Appeals decided years later that those election rules were not effective because the legislature had failed to exempt the measure from the different election rules set out in ORS 221.610 and ORS 221.621, the measure received a majority under the election rules that Measure 93 provided.

It is for that reason that we decline to engage with petitioners' framing of the issue, *i.e.*, as asking whether we will in this case recognize and uphold a rule against retrospective changes in election rules that change an election's outcome. Instead, we consider whether there is an actual or implied rule against what SB 226 explicitly seeks to accomplish, which is to retroactively cure a defect in the Measure 93 election.

The general rule, outside the context of criminal law, is that "a legislature may pass a retroactive law which could validate any act which it could in the first instance have authorized, subject to the restriction that it could not impair the obligation of a contract or a vested right." *Smith v. Cameron et al.*, 123 Or 501, 507, 262 P 946 (1928). *See also Carey v. Lincoln Loan Co.*, 342 Or 530, 539, 157 P3d 775 (2007) ("[D]efects in laws can be cured by subsequent legislative action, as long as the subsequent action does not impair vested rights or the obligations of contract."). Thus, in *Nottage v. City of Portland,* 35 Or 539, 58 P 883 (1899), this court held that a procedural defect in a petition for a street assessment—a failure to include the names of one-half of the affected property owners in the petition, as required by the city charter—had been cured by a legislative amendment to the city charter enacted after the assessment had been made. In *Cameron*, on the other hand, the court concluded that a judgment against the state in an eminent domain action, which had resulted from a constitutional defect in the eminent domain statute, could not be "cured" through a retroactive amendment to the eminent domain statute, because the landowner in whose favor the judgment had been entered had obtained a vested right in the judgment. 123 Or at 506-07.

Notably, in at least one Oregon case, that general rule has been applied in the context of a defective election. In *State v. James et al.*, 189 Or 268, 219 P2d 756 (1950), relators challenged the City of Springfield's formation of a park and recreation district and a bond election for funds for the district, arguing that the city had lacked authority to form the district and that the bond election had not followed applicable procedures. The adverse parties argued that any defect in the formation of the district and the bond election had been cured by subsequent legislation—a statute that purported to retroactively "validate[ ], ratif[y], authorize[ ], approve[ ] and confirm[ ] the organization of any park and recreation district organized pursuant to [a specified statute] *** [and] all proceedings theretofore taken in the authorization and issuance of bonds by any park and recreation district." *Id.* at 272. This court agreed, holding that the general rule stated in *Nottage* and other cases applied:

"If the thing wanting or which failed to be done, and which constitutes the defect in the proceedings, is something the necessity for which the legislature might have dispensed with by a prior statute, then it is not beyond the power of the legislature to dispense with it by a subsequent statute." *Id.* at 273-74.

The same rule has been applied in other jurisdictions in a variety of cases involving elections, including elections to incorporate municipalities. *See, e.g.*, *Town of Fox v. Town of Kendall*, 97 Ill 72 (1880) (vote upon the question of township support of paupers—submitted to voters before the law provided for submission of such question to voters—was defective, but defect in election could be cured by subsequent curative act to the effect that such elections should be treated as legal and binding); *State ex rel Johnson v. Union Free High School Dist. of Polk and St. Croix Counties*, 179 Wis 631, 191 NW 972 (1923) (where legislature had authority to provide for formation of school districts in any manner, it could enact legislation retroactively validating defective election to form school district); *Sullivan v. Volusia County Canvassing Bd.*, 679 So 2d 1206 (Fla 1996) (state legislature had power to ratify election process that incorporated city and dissolved fire and municipal services district, despite alleged notice and ballot irregularities); *City of Muscatine v. Waters*, 251 NW2d 544 (1977) (Iowa 1977) (state legislature cured notice defect in municipal annexation election by retroactive legislation).

It appears, then, that there is no implied or inherent principle or law that precludes retroactive legislation to cure a defect in an earlier election, with the caveat that the "cure" must not disturb any vested interest and must be limited to actions that the legislature had authority to take in the first instance. Here, petitioners have not shown that the legislature lacked *authority* to provide the alternative procedures for a dissolution election that it attempted to provide in HB 3085, so they have no room to challenge SB 226's validation of the 2016 disincorporation election held under those procedures on that ground. And petitioners do not provide an argument that any vested interest will be affected if the election is deemed to be valid, other

than asserting that the *De Young* decision by the Court of Appeals became final in 2019. Accordingly, we reject plaintiffs' argument that giving SB 226 its intended retroactive effect would offend some implied or inherent constitutional principle.

C.  *Equal Protection and Due Process under the United States Constitution*

   Petitioners note that, under *Bush v. Gore*, 531 US 98, 121 S Ct 525, 148 L Ed 2d 388 (2000), the Due Process and Equal Protection Clauses of the Fourteenth Amendment are violated when, in an election on a matter in which all electors have been granted an equal vote, the state makes arbitrary changes that might increase the value of the votes of some electors *vis-à-vis* that of others. Petitioners contend that, in enacting SB 226, the legislature did what was prohibited in *Bush*, because it "retroactively changed the value of the votes against [Measure 93], diminishing their value and increasing the value of those voting in favor." Petitioners argue that because SB 226 authorized disincorporation upon the vote of a majority of those voting—rather than a majority *of electors*, as required by ORS 221.610—it had the effect of diminishing the value of "no" votes relative to the value of "yes" votes. ORS 221.610, petitioners assert, was intended to and did have the effect of treating electors who did not vote as if they had voted "no," and SB 226 improperly eliminated that aspect of the disincorporation vote.

   The state responds that *Bush* is irrelevant because it is about uniformity of procedures for tabulating votes, and petitioners' challenge here has nothing to do with the tabulation of votes. We agree. We also agree with the state that petitioners are wrong when they characterize SB 226 as changing the value of some votes cast in the Measure 93 election after the fact. The provision in SB 226 for disincorporation by a simple majority of those voting exactly mirrors what was provided in Measure 93 itself, so the electors who voted, or chose not to vote, in the 2016 disincorporation election can be presumed to have understood what their votes (or nonvotes) were worth at the time. In short, the notion of a post-election change of rules that underpins petitioners'

equal protection and due process argument is not consistent with the facts.[6]

## D.  *Home Rule*

We turn to petitioners' arguments regarding the home rule provisions in the Oregon Constitution, which raise important questions about the interplay between the legislature's plenary authority to enact substantive legislation and the constitutional home rule authority of local governments to establish and modify their political structures as they see fit. Two of the three arguments petitioners make apply in the same way to section 1 and to sections 2 and 3 (combined) of SB 226, and we consider those first. Before analyzing petitioners' arguments, we set out the constitutional home rule provisions and the relevant case law.

The first home rule provision, Article XI, section 2, grants the voters of every city and town the authority to enact and amend their own municipal charter, and bars the legislature from enacting, amending, or repealing any city charter.[7] The second, Article IV, section 1(5), provides:

"The initiative and referendum powers reserved to the people by subsections (2) and (3) of this section are further reserved to the qualified voters of each municipality and district as to all local, special and municipal legislation of every character in or for their municipality or district. The manner of exercising those powers shall be provided by general laws, but cities may provide the manner of exercising those powers as to their municipal legislation. In a city,

---

[6] Petitioners also argue that SB 226 cannot retroactively validate the Measure 93 election because Measure 93 violated ORS 171.134, a statute that requires that any "measure summary" prepared by the legislature score at a certain level on a readability test. Even assuming that Measure 93's summary violated ORS 171.134, neither ORS 174.134 nor any other source of law suggests that Measure 93 or SB 226 might be invalid for that reason. Petitioners also argue that SB 226 violates ORS 171.127 because the bill failed to "bear the name" of the entities that requested it at the time the bill was filed, as required by that statute. Again, however, even accepting petitioners' factual premise, petitioners point to no source of law that would invalidate such a statute after it was enacted.

[7] Article XI, section 2, provides, in part:

"The Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the state of Oregon."

not more than 15 percent of the qualified voters may be required to propose legislation by initiative, and not more than 10 percent of the qualified voters may be required to order a referendum on legislation."

Much has been written about the meaning and effect of those two provisions, which were proposed by initiative and adopted by the people in 1906. The controlling interpretation of the provisions is the one that this court announced in *La Grande/Astoria v. PERB*, 281 Or 137, 576 P2d 1204 (1978) (*La Grande I*), and reaffirmed on rehearing, *La Grande/Astoria v. PERB*, 284 Or 173, 586 P2d 765 (1978) (*La Grande II*). In *La Grande I*, the court recounted the history of the adoption of the provisions as initiative measures. That history showed that the primary concern of those who advocated for the measures was that the voters of municipalities be permitted to determine the structure and organization of their own municipal governments, but that they did not intend to oust the state legislature from making substantive law affecting cities and towns. 281 Or at 142-45. Based on that history and the subsequent case law, this court held in *La Grande I* that the prohibition in Article XI, section 2, on the Legislative Assembly "enact[ing], amend[ing,] or repeal[ing] any charter or act of incorporation" bars the legislature from legislating only with respect to the "structure and organization" of local government. *Id.* at 150. The sole exception to such interference with the form of local government, the court added, would be a state law touching on local structures and procedures that "served a predominant social interest extending beyond the local municipality," for example, a law "designed to safeguard the interest of private persons in the procedures of local government." *Id.* at 146.

The court also explained, however, that the grants of authority to the voters of every municipality to enact and amend their own municipal charters and to exercise the initiative powers "as to all local, special and municipal legislation" did *not* impose limits on the legislature with respect to making *substantive* law that affects municipalities. *Id.* at 145. And because the municipal government and the state legislature will at times quite lawfully pursue substantive objectives regarding the same subjects,

the court in *La Grande I* opined, there will be occasions when state and local substantive laws overlap or conflict. In such cases, the court added, the state and local law must be allowed to operate concurrently, if possible, but if that is *not* possible, the state law will displace the local law. *Id.* at 147-49.

*La Grande I* summarized those conclusions in a rule that has been applied in home rule challenges ever since:

"When a statute is addressed to a concern of the state with the structure and procedures of local agencies, the statute impinges on the powers reserved by the [1906] amendments to the citizens of local communities. Such a state concern must be justified by a need to safeguard the interests of persons or entities affected by the procedures of local government.

"Conversely, a general law addressed primarily to sub-stantive social, economic, or other regulatory objectives of the state prevails over contrary policies preferred by some local governments if it is clearly intended to do so, unless the law is shown to be irreconcilable with the local commu-nity's freedom to choose its own political form. In that case, such a state law must yield in those particulars necessary to preserve that freedom of local organization."

281 Or at 156. *La Grande II* confirmed the quoted rule in all of its particulars. 284 Or at 177-86.

Having set out that basic analytical framework for considering challenges under the home rule provisions of the Oregon Constitution, we turn to petitioners' home rule-based arguments.

1.  *Is SB 226 a legislative attempt to "amend" section 27 of the city's charter in violation of the city's home rule authority?*

Petitioners' initial home rule argument focuses on the specific prohibition in Article XI, section 2, on the leg-islature "amend[ing] \*\*\* any charter for \*\*\* any munic-ipality, city or town." They argue that SB 226 attempts to "amend" the city's charter by excepting a specific disincor-poration election, *i.e.*, the 2016 vote on Measure 93, from sec-tion 27 of the charter, which provides: "City elections must

conform to state law except as this charter or ordinances provide otherwise."[8]

Petitioners first contend that the Damascus City Council has interpreted "state law" in section 27 of the charter as referring to state law as it existed on the date of the adoption of the charter, and they insist that, under *Fifth Avenue Corp. v. Washington Co.*, 282 Or 591, 581 P2d 50 (1978), this court must defer to that interpretation. Petitioners then note that, when the city adopted its charter in 2005, state law, including ORS 221.610 and ORS 221.650, provided only one election procedure for disincorporating a city—an affirmative vote by a majority of the electors of the city, in a November election, on a disincorporation measure placed on the ballot in accordance under the initiative process set out in ORS 250.265. Petitioners argue that, because section 27 of the city charter incorporates state law as it existed in 2005, any disincorporation election must follow that procedure. They contend that SB 226 purports to amend section 27 by imposing different election rules (an affirmative vote by the majority of those voting, in a May election, on a disincorporation measure referred to the people by the legislature) for the vote on Measure 93.

An initial problem with petitioners' theory arises out of their bid for deference in respect to the meaning of section 27 of the city charter. It is true that, in *Fifth Avenue Corp.* we held that the interpretation of a county's charter by the county's governing body should be given deference. We explained there that the county board of commissioners "composed as it is of popularly elected local officials directly accountable to their constituency *** , in the first instance, should have the power and right to interpret local enactments." 282 Or at 599. But whether the interpretation of section 27 of the charter that petitioners offer here is entitled to deference under that rule is highly debatable. The interpretation of section 27 that petitioners offer was adopted not in 2005, when the charter was enacted, or 2016,

---

[8] With respect to petitioners' various home rule arguments based on the city's charter, we note that the charter contains no specific provision regarding disincorporation or disincorporation elections. We express no opinion as to whether the result here would be different if a city's charter included a provision establishing the city's own procedure for disincorporation.

when the Measure 93 vote occurred, but in 2019 and in anticipation of the present litigation, by a group of persons who have *assumed* the title of Damascus City Council without the benefit of being elected to that body. Whether or not the group has a legitimate basis for claiming that title, it cannot claim to be composed of "popularly elected local officials directly accountable" to the people of Damascus.

Even setting the deference issue aside, petitioners' argument remains problematic. Petitioners assume that SB 226 "amends" the city's charter in violation of Article XI, section 2, because it is inconsistent with one of the charter's provisions (as that provision is interpreted by petitioners). But, given the construction of Article XI, section 2, in the *La Grande* cases, that assumption is too simplistic. First, plaintiffs' argument assumes that the "state law" in section 27 to which local elections "must conform" is state law as it existed when the charter was adopted in 2005, rather than "state law" as it has changed over time. Yet nothing in section 27 suggests that the reference to "state law" was intended to be limited in that unusual way. If plaintiffs' dubious premise is incorrect, then "state law" in section 27 may include HB 3085 and SB 226, defeating plaintiffs' argument at the outset.

Second, even if we accept petitioners' reading of section 27 and their argument that SB 226 conflicts with that charter provision, their position ignores difficult questions about whether a statute that sets out requirements for a municipal disincorporation election is directed at the "structure and organization" of municipalities (as opposed to substantive policy)[9] and, if so, whether it is "justified by a need to safeguard the interests of persons or entities affected by the procedures of local government." *La Grande I*, 281 Or at 156. By framing the issue solely in terms of the text of Article XI, section 2—whether SB 226 "amend[s]"

---

[9] As suggested in *La Grande I*, 281 Or at 150, the mere fact that SB 226 is inconsistent with a provision in a city charter does not resolve this question:

   "The 1906 amendments were not designed to exalt form over substance, on the one hand leaving all local modes of government at the mercy of the legislature unless written into the local charter and on the other hand immunizing from state law any local policy on any subject if only it is placed in the charter."

the city charter—petitioners seek to avoid those questions, which are critical to this court's longstanding interpretation of that provision. But ultimately these issues must be addressed—and we do so below in our discussion of petitioners' third home rule argument.

> 2. *Does SB 226 violate the city's home rule authority by providing the "manner of exercising" initiative and referendum powers as to "municipal" legislation?*

Petitioners' second home rule argument focuses on the wording of Article IV, section 1(5), and, again, fails to consider the basic principles of the constitutional home rule provisions as interpreted in the *La Grande* cases. Petitioners begin by noting that Article IV, section 1(5), reserves the initiative and referendum powers "as to all local, special and municipal legislation" to the voters of the municipality, and that provision further instructs that "cities may provide the manner of exercising [the initiative and referendum] powers as to their municipal legislation." Petitioners then assert that two sections of the city's charter—section 27, described above, 367 Or at 56-57, and section 6(a), pertaining to local processes for initiative and referendum[10]—in fact direct "the manner of exercising" the initiative and referendum powers as to "municipal" matters that Article IV, section 1(5), reserves to the voters of Damascus. From those premises, petitioners contend that, insofar as SB 226 purports to ratify an election held in a manner that is inconsistent with sections 6(a) and 27 of the city's charter regarding the manner of exercising the initiative and referendum powers as to municipal matters, it violates Article IV, section 1(5).[11]

---

[10] Section 6(a) of the city charter provides:

"Any change to the general laws of the State of Oregon regarding the processes for the use of the initiative, referendum and recall by city voters shall not be valid, unless such change has been proposed by initiative petition and approved by a majority of the voters in a general election."

[11] Petitioners' theory as to why SB 226 conflicts with or creates an exception to section 27 of the city's charter depends on the proposition that section 27 incorporates state law with respect to disincorporation procedures as it existed at the time of the city charter's adoption, but not as subsequently amended. As discussed above, 367 Or at 57-58, that proposition is debatable.

Petitioners' theory as to why SB 226 conflicts with or creates an exception to section 6(a) of the city charter depends on their understanding of the holding in *De Young*, *viz.*, that a disincorporation vote can be triggered only by an

Petitioners' argument is misplaced. The simple answer is that neither SB 226 nor Measure 93 has the purpose or the effect of displacing the city charter's provisions that direct, in the words of Article IV, section 1(5), the "manner of exercising" the initiative and referendum powers as to "*their municipal* legislation" (emphasis added)—that is, as to the city's regulatory authority over police, health, zoning, and the myriad other aspects of its own local governance. The city's ability to establish and modify as it deems appropriate the role of local initiatives and referenda in making or changing such city ordinances, charter provisions, or other aspects of the city's "municipal legislation" is unaffected by SB 226 and Measure 93. Those legislative actions thus do not interfere with the city's control of the "manner of exercising" the initiative powers that are reserved to the people of Damascus with respect to the city's own "municipal legislation."

SB 226 and Measure 93 are not "municipal legislation," and they do not interfere with the "manner in which" the city may exercise initiative and referendum powers over its "municipal legislation." Rather, those measures are both legislative acts that provide a mechanism for triggering and carrying out a disincorporation election under *state*, not municipal, law, that supplements the procedure provided by state law before their passage. Petitioners never suggest that the long-standing state statutes regarding the procedures for the disincorporation of local governments—such as ORS 221.610, ORS 221.621, and ORS 221.650—are beyond the authority of the legislative assembly or that they violate the constitutional home rule provisions. Indeed, much of petitioners' case is based on their view that those statutes *should* be followed. But if those statutes are a valid exercise of state authority and not an interference with home rule powers, it is difficult to understand how petitioners can maintain

initiative petition. That understanding of *De Young* is incorrect: Although the Court of Appeals in *De Young* questioned whether "the legislature that enacted ORS 221.610 and ORS 221.621 intended to leave open other paths [beside an initiative petition] to disincorporation—such as pursuant to legislative referral," it ultimately concluded that it need not decide the issue because the legislature had failed to take the necessary steps to exempt the Measure 93 election that it contemplated from complying with ORS 221.610 and ORS 221.621. 297 Or App at 369-70.

that changes in those procedures, such as those contained in Measure 93 and SB 226, are beyond the authority of the legislative assembly. We reject petitioners' argument that SB 226 is invalid because it conflicts with Article IV, section 1(5)'s reservation of the "manner of exercising [the initiative and referendum powers] as to [the city's] municipal legislation." It does not.

 3. *Application of* La Grande I

  a. The parties' arguments and home rule principles

 Petitioners' remaining argument with respect to the legislature's enactment of an alternative process for holding a disincorporation election and its ratification of the results of that election in SB 226 correctly focuses on the central home rule principles set out in *La Grande I*: whether those enactments interfere with the "structure and procedures" of local government, or instead advance substantive policy interests of the state. As interpreted in *La Grande I*, 281 Or 137, Article XI, section 2, does not curtail the legislature's power to pursue the state's substantive policy interests and, in fact, permits such policy interests to prevail over any inconsistent substantive policy set out in a municipal charter.

 Petitioners argue that, insofar as SB 226 attempts to ratify the results of the vote on Measure 93, it addresses a specific municipal election—the disincorporation of a specific local government—and the procedural mechanisms by which such a disincorporation can be achieved. Petitioners maintain that the election, the subject of the election, and procedures for the election are all clearly matters of "the structure and procedures of [a] local agenc[y]" within the meaning of the *La Grande I* rule. For convenience, we again set out the paragraphs in that case where this court summarized the central home rule principles:

> "When a statute is addressed to a concern of the state with the structure and procedures of local agencies, the statute impinges on the powers reserved by the [home rule] amendments to the citizens of local communities. Such a state concern must be justified by a need to safeguard the interests of persons or entities affected by the procedures of local government.

> "Conversely, a general law addressed primarily to sub-
> stantive social, economic, or other regulatory objectives of
> the state prevails over contrary policies preferred by some
> local governments if it is clearly intended to do so, unless
> the law is shown to be irreconcilable with the local commu-
> nity's freedom to choose its own political form. In that case,
> such a state law must yield in those particulars necessary
> to preserve that freedom of local organization."

281 Or at 156.

Petitioners argue that only the first paragraph above is at issue here: whether SB 226 "impinges on the powers reserved by the [home rule] amendments to the citizens of local communities" and thus violates those amendments, unless the legislature's intervention was "justified by a need to safeguard the interests of persons or entities affected by the procedures of local government." *La Grande I*, 281 Or at 156. The stated exception is inapplicable, petitioners argue, because the legislature had no basis for thinking that the interests of persons or entities who would be affected by the election procedures provided in the city's charter would need to be safeguarded, and respondents do not disagree. Therefore, petitioners conclude, SB 226, which seeks to except the disincorporation vote on Measure 93 from both the election provision (section 27) and initiative and referendum provision (section 6(a)) of the city's charter, must give way to the home rule rights that the constitution reserves to local voters, and to the charter that those voters adopted.

Petitioners continue that SB 226 is not a "*general* law addressed primarily to substantive social, economic, or other regulatory objectives of the state," which, under the second paragraph of the rule in *La Grande I*, would in most circumstances prevail over contrary policies of local governments. Instead, they assert, section 1 of SB 226 is a special or local, not "general," law because it applies only to one six-month window of past actions, into which only the 2016 City of Damascus disincorporation election and its aftermath would fit. And they argue that sections 2 and 3, together, also are special or local laws, and not a "general" law, because section 3, providing for retroactive application of the seemingly broadly worded section 2, would affect only

one past disincorporation election—the 2016 election to disincorporate the city.

The state responds that SB 226 is a "general law" addressed to substantive social, economic, or other regulatory objectives of the state and that it is not addressed to the "structures and procedures" of local governments. It first argues that, in determining whether SB 226 is a general law, it does not matter that it affects only one election in one city—because a general law is simply one that "operates equally and uniformly upon all persons, places, or things brought within the relation and circumstances for which it provided." *Farrell v. Port of Columbia*, 50 Or 169, 173, 91 P 546 (1907). SB 226 fits that description, in the state's view, because it does not specify that it applies only to the Measure 93 election or the City of Damascus, but rather sets out certain requirements that, by the statute's terms, apply to any election in any place within the specified parameters.

The state also argues that SB 226 is addressed to a substantive social, economic, or other regulatory objective of the state, to wit, an interest "in establishing and governing the processes by which voters can disincorporate a city, as evidenced by the procedures outlined in ORS chapter 221 itself." As to the latter point, the state asserts that, given that the legislature already has enacted a statute that governs the process of disincorporation—which petitioners, as noted, do not challenge as violating constitutional home rule principles—and given that petitioners "do not contend that the legislature lacks authority to amend, expand, or abolish those statutory procedures," there is little room for arguing that this particular statute is different and therefore unauthorized under the rule of *La Grande I.* Furthermore, the state asserts, this is a case in which the charter at issue seems to explicitly recognize the state's interest in the elections through which disincorporation is achieved: Section 27 of the charter states that the city's elections "must conform to state law," except when the city's charter and ordinance provide otherwise. Finally, the state argues, while SB 226 might be "procedural" in the sense that it concerns the legislature's use of its authority to set the terms of *its own*

*referenda*, it is not "addressed to a concern of the state with the structure and procedures *of local agencies.*"

Based on the *La Grande I* rule's reference to "a general law addressed primarily to substantive social, economic, or other regulatory objectives of the state," 281 Or at 156, both parties focus in part on the issue whether SB 226 is a "general," as opposed to a special or local, law. But that issue is not a significant one. In *La Grande II*, this court went to considerable lengths to disabuse the petitioners there of the notion that the constitutional home rule provisions precluded the legislature from making local or special laws of any sort. Referring to its earlier decision in *La Grande I*, the court observed:

> "The limitation stated in [A]rticle XI, section 2, is only that '[t]he Legislative Assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town.' The opinion holds that this limitation refers to legislative interference with the political arrangements made in local charters and 'charter-like' provisions but does not invalidate general social, economic, or other regulatory statutes merely because they contradict local policies. This holding concerns only the constitutional limits on the state legislature; it does not concern what may be done under local authority granted by charter, statute, or 'municipal legislature' under [A]rticle IV, section 1(5), as petitioners appear to fear.
>
> "*The constitution shows, however, that beyond the limitation on enacting, amending, or repealing charters[,] the legislature did not lose the power to enact purely local laws.*"

*La Grande II*, 284 Or at 183-84 (emphasis added).

What that means, in the end, is that the critical distinction is not between special or local laws and general laws, but, rather, between laws that address the "structures and procedures" of local government and those that address "substantive social, economic, or other regulatory objectives of the state." That difference determines whether a statute enacted by the legislature violates the home rule provisions of the Oregon Constitution.

   b. The legislature's instruction to the court regarding how to determine the validity of SB 226

Because petitioners' arguments that we have considered thus far have been directed at the asserted invalidity of SB 226 as a whole, we have not been required to differentiate between the two alternative paths that the legislature included in SB 226 to validate the Measure 93 disincorporation election. Petitioners' arguments regarding the home rule authority under *La Grande I*, however, raise that possibility. To summarize our earlier discussion, SB 226, section 4(5), instructs this court first to determine whether section 1 of the law is valid in curing any defect and ratifying the result of a disincorporation election that comes within the terms of that section. The City of Damascus disincorporation vote pursuant to Measure 93 is such an election. Section 4(5) goes on to provide that if, and only if, the court determines that section 1 is not valid should the court proceed to determine the validity of sections 2 and 3 as an alternative path to curing any procedural defects and ratifying the results of a qualifying disincorporation election.

Section 1 would accomplish the legislature's stated goals by providing that "notwithstanding ORS 221.610, 221.621, and 221.650 a city shall be deemed to be disincorporated and shall cease to exist" if the Secretary of State determines (among other things) that a disincorporation election was held in the city between January 1 and July 1, 2016, in which the majority of those voting voted in favor of disincorporation. In effect, section 1 is directed to disincorporation elections that occurred in a single six-month time period, and, although SB 226 did not explicitly refer to the Measure 93 disincorporation election, it appears that that election was the only election to which section 1 applies. Sections 2 and 3 take a different approach to the legislature's goals. Section 2 adds to Oregon law an alternative disincorporation procedure to that provided in ORS 221.610 and ORS 221.621: a legislative referral of the disincorporation question to the city's residents, with disincorporation occurring upon a vote of the majority of those voting. Section 3 makes that procedure retroactive to disincorporation elections that occurred before the passage of SB 226, if they

meet the law's requirements. In contrast to section 1, which applies to a single six-month time period in 2016, section 2 makes the additional disincorporation path an ongoing provision of Oregon law.[12]

It is obvious from the precis above that section 1 and sections 2 and 3 raise in slightly different ways the home rule question, *i.e.*, whether they unconstitutionally interfere with "structures and procedures of local agencies" or are instead permissible laws addressed "primarily to substantive social, economic, or other regulatory objectives of the state." *La Grande I*, 281 Or at 156. Petitioners, of course, assert that both section 1 and sections 2 and 3 are invalid, as they must if they are to prevail. They argue that both paths strike at the heart of the "structure and procedures" of the City of Damascus by, in effect, using a state law (albeit one seeking to ratify a local election that took place pursuant to earlier legislative action) to eliminate the city itself, including its "structure and procedures." For its part, the state argues that both sections are valid exercises of state regulatory authority over procedures for disincorporation elections and that they are valid for the same reason that the pre-SB 226 statutes regarding such elections are valid.

If we were to follow the legislature's instruction in SB 226, section 4(5), we would first consider whether section 1 is invalid and, only if we so found, would we consider whether sections 2 and 3 are valid. We respectfully decline to do so, for several reasons. First, virtually all the state's briefing and most of petitioners' briefing on the home rule issues does not distinguish between the different paths established by section 1 and sections 2 and 3. The parties make essentially the same arguments for and against the validity of those statutory provisions and do not develop

---

[12] No one disputes that the impetus for SB 226 was the legislature's intent to ratify the 2016 City of Damascus disincorporation election. Sections 2 and 3 do more than that by amending Oregon law to provide an additional disincorporation process to that set out in ORS 221.610 and ORS 221.621. But that is not unusual in lawmaking. As this court stated in *South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 531, 724 P2d 788 (1986), "Statutes ordinarily are drafted in order to address some known or identifiable problem, but the chosen solution may not always be narrowly confined to the precise problem. The legislature may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention."

specific arguments as to why one might be valid and the other invalid. Second, for reasons that we outline below, we consider the validity of the section 1 path to be a close constitutional question, while we can conclude with complete confidence that sections 2 and 3 provide a valid constitutional path to achieving the legislature's stated intent of "curing any defect in the procedures" and "ratifying the results" of any disincorporation vote that meets the requirements of SB 226, including the vote at issue here. This court has often chosen to avoid interpreting a statute in a way that would render it unconstitutional if a different, but also plausible, interpretation would be constitutional—the so-called "avoidance canon." *See State v. Duggan*, 290 Or 369, 373, 622 P2d 316 (1981) (rejecting interpretation that "may well" be unconstitutional). The legislature's instruction that we decide the validity of section 1 and, only if we conclude that it is invalid, decide the validity of sections 2 and 3, raises several constitutional issues related to the avoidance canon and the principles underlying it, and we turn briefly to them.

The avoidance canon, in part, is a rule of judicial restraint, in that it allows the court to avoid holding all or part of a statute unconstitutional and "thus minimize the possibility of conflict between the branches." Jack L. Landau, *Oregon Statutory Construction*, 97 Or L Rev 583, 718 (2019) (discussing avoidance canon). Moreover, when there are two plausible constructions of a statute, one constitutional and the other unconstitutional, we assume that the legislature intended the constitutional meaning, so will adopt that construction. *State v. Kitzman*, 323 Or 589, 602, 920 P2d 134 (1996) (so holding).

This principle is similar in some respects to our longstanding practice of not addressing alternative arguments offered by parties in a case, if one argument is dispositive. *See, e.g.*, *State v. Henderson*, 366 Or 1, 5 n 1, 455 P3d 503 (2019) ("Because we agree with the state on its primary argument ***, we do not reach the merits of its alternative argument."). That practice allows the court to avoid rendering decisions that might be considered advisory in nature, because the parties' dispute has been effectively resolved by the primary holding, as in *Henderson*, and to reduce the

tendency of appellate judges to include unnecessary *dicta* in their opinions.[13]

Here, in addition to the issue of avoiding ruling on the constitutional validity of section 1—which we would be required to do if we followed the legislature's instruction—there is the additional potential constitutional issue of whether the legislature's instruction itself violates the separation of powers provision of the Oregon Constitution, Article III, section 1, because it unduly interferes with or burdens our exercise of the judicial function.[14] This court sometimes has held that legislative directives to the court improperly interfere with the judicial function, *see, e.g.*, *In re Ballot Title*, 247 Or 488, 431 P2d 1 (1967) (declining legislative directive to review ballot title in absence of case brought by a party or other judicial process; such a review would be "advisory"), although we also have upheld general statutes requiring the courts to follow certain procedures when we conclude that they do not unduly burden or interfere with that function. *See, e.g.*, *State ex rel Emerald PUD v. Joseph*, 292 Or 357, 362, 640 P2d 1011 (1982) (holding statute requiring Court of Appeals to decide certain cases within three months of filing not facially unconstitutional).

The legislature's instruction in SB 226 is unusual. It does not simply confer original jurisdiction on this court to decide a particular, justiciable case—a directive that we routinely honor. Nor does it tell us what result we should reach in deciding the case, which we likely would view as a clear interference with the judicial function. Rather, it directs us to decide the issues in a specific case in a particular order, which seems to fall somewhere between the prior two examples. Moreover, the principles mentioned above—the avoidance canon, our usual approach when alternative

---

[13] We express no opinion here regarding the circumstances in which advisory opinions may or may not be unconstitutional or the weight to be given to *dicta* in judicial opinions. Our point is that there are prudential and jurisprudential reasons to avoid unnecessarily deciding legal issues that may be presented in a case, if the case can be appropriately resolved on more limited grounds.

[14] Article III, section 1, provides, in part:

"The powers of the Government shall be divided into three separate branches, the Legislative, the Executive, including the administrative, and the Judicial; and no person charged with official duties under one of these branches, shall exercise any of the functions of another * * *."

arguments are raised in support of the same result, and the potential constitutional separation of powers issue—are not easily applied to the SB 226 instruction. Nevertheless, we have serious concerns. We are reticent about unnecessarily holding part of a statute unconstitutional or offering what might be considered an advisory opinion on the constitutionality of part of a statute. We also are not inclined to issue a definitive ruling on the constitutional separation of powers question whether it is proper for the legislature to decide the order in which we may consider alternative arguments in a specific case.[15] For those prudential reasons, we respectfully decline to follow the legislature's instruction in SB 226, section 4(5). We instead will decide this case in a way that avoids reaching those two potentially close constitutional questions.

We first explain briefly why we consider the validity of the section 1 approach to ratifying the results of the Measure 93 election to present the closer constitutional question, as that conclusion is the reason we instead focus on sections 2 and 3. Section 1 provides that a city whose disincorporation election meets the requirements set out in SB 226—including having occurred between January 1 and July 1, 2016—"shall be deemed disincorporated." The only effect that that section has, or will ever have, appears to be to ratify the disincorporation of the City of Damascus; the section has no ongoing role in future disincorporation elections. As discussed above, petitioners' argument that SB 226 unconstitutionally impairs the city's home rule power by dismantling its "structure and procedures" is plausible as applied to section 1. But the state's response, as applied to section 1, also is plausible: In SB 226, according to the state, the legislature exercised its historic practice of regulating the procedures for the disincorporation of local governments, as it has for many decades, including through statutes such as ORS 221.610 and ORS 221.621. In Measure 93, it provided an alternative path for a disincorporation election; that path was followed and disincorporation chosen;

---

[15] The parties' briefing accepts the legislative directive about the sequence in which we are to decide the validity of different provisions in SB 226, and neither party raises or briefs any separation of powers concerns in relation to that issue. That is an additional reason that we choose not to address the issue.

a court later found a procedural flaw in the measure; and SB 226 is a legitimate means of curing that flaw and ratifying the results of the election. However, we decline to reach the question of the constitutional validity of section 1, because we conclude that the validity of sections 2 and 3 to accomplish the intent of the legislature is clearly established in our home rule cases.

  c. Sections 2 and 3 of SB 226

   Sections 2 and 3 provide an alternative mechanism to section 1 by which the voters of a city can decide to disincorporate the city. To review, ORS 221.610 and ORS 221.621 have long provided that the electors of a city may seek a disincorporation election through an initiative petition and that the city shall be disincorporated if a majority of the city's electors vote in favor at the first general (November) election after the filing of the initiative petition. Section 2 of SB 226 adds to Oregon law a procedure whereby the legislature may refer the question of disincorporation to the city's residents, with disincorporation occurring upon a vote of a majority of those voting on the question in the first "primary" (May) election following the referral. Section 3 makes section 2 applicable "to Acts enacted or referred, and elections held, before the effective date of this 2019 Act," meaning that any vote to disincorporate in a past election would be effective, if held under equivalent procedures and standards to those provided in section 2.

   Sections 2 and 3 do not directly effect the disincorporation of the City of Damascus or any other city. Rather, section 2 establishes as part of Oregon law a different statutory procedure for holding a vote on disincorporation in addition to that which already exists, and section 3 provides that that alternative procedure applies retroactively. Petitioners argue that the two sections are addressed to the "procedures" of local government and therefore impinge on powers reserved to the local government, but that argument ignores the state's persuasive response that it has a substantive interest in regulating the procedures for the disincorporation of local governments. The state's argument is even more persuasive when considering that, when SB 226 was enacted, the state had long been regulating the procedures

for the disincorporation of local governments under ORS 221.610 and ORS 221.621 (or predecessors of those statutes). Petitioners have never argued that those two statutes violate the home rule provisions in the Oregon Constitution. In fact, they appear to view them as legitimately controlling local disincorporation elections. Ultimately, then, we are persuaded that sections 2 and 3 of SB 226 are addressed to a substantive regulatory interest of the state.

Having established that point, the question arises whether those sections are nevertheless invalid under the *La Grande I* rule, because they are "irreconcilable with the community's freedom to choose its own political form." 281 Or at 156. Petitioners argue that SB 226, including sections 2 and 3, does just that because it imposes a political form— disincorporation—on a single, specific geographic area based on the preferences of the legislature or of certain local governments (Clackamas County and the City of Happy Valley) that pushed the legislature for a "fix" of the city's disincorporation dilemma triggered by the Court of Appeals decision in *De Young*. But while that argument might reasonably be leveled at section 1 of SB 226, it does not apply to sections 2 and 3, which establish and make part of Oregon law an alternative statutory mechanism for triggering a disincorporation vote by the people of a municipality and allow that mechanism to apply retroactively, for the reasons we have explained above.

We conclude that sections 2 and 3 do not violate the home rule provisions of the Oregon Constitution.

E. *Petitioners' Separation of Powers Challenge to Sections 2 and 3 of SB 226*

Because we do not reach the question of the validity of section 1 as a means of ratifying the 2016 disincorporation election, we need not consider how that section fares under petitioners' argument that it violates separation of powers principles incorporated in Article III, section 1, of the Oregon Constitution. We confine our analysis to sections 2 and 3 of SB 226. Petitioners contend that those sections violate Article III, section 1, because they constitute an act by the legislative branch that purports to reverse a decision by

the judicial branch (specifically, the Court of Appeals decision in *De Young*), thereby reviving a matter that already had been decided by the judicial branch. That argument is unavailing.

In *McFadden v. Dryvit Systems, Inc.*, 338 Or 528, 112 P3d 1191 (2005), this court considered whether Article III, section 1, had been violated when the legislature amended the statute of limitations for product liability actions to include a discovery rule and then expressly provided that the change would apply retroactively to "revive" causes of action that had been time barred under the prior statute, should such cases be refiled. The defendant had argued that the statute represented a legislative usurpation of the judicial function of deciding cases because it purported to affect the rights of litigants whose rights already had been decided by the judicial branch. *Id.* at 536. The court noted that the question presented was *not* whether the legislature had purported to overturn cases that the courts had decided (it had not), but rather whether it purported to overturn the principle of *res judicata*—a judicial principle—as it ordinarily would apply to newly filed cases on the same claims. *Id.* at 537. The court answered the question by quoting from *Huntington v. Sulmonetti*, 276 Or 967, 972, 557 P2d 641 (1976):

> "The legislature is not setting aside the court's original determination, which is final as to the law then existing. It is merely deciding that prior claimants should have another opportunity to file and litigate their claims under a new and different set of standards. If the legislature would originally have had authority to enact the statutes relating to the filing of claims as such statutes were subsequently amended (and it is plain it would have had), it had the authority to make the amendment retroactive and to permit claimant to refile despite the intervening litigation."

*McFadden*, 338 Or at 537-38 (quoting *Sulmonetti*, 276 Or at 972). The court in *McFadden* contrasted such legislative acts that grant new rights of appeal and make those rights retroactive—a legislative function—with legislation that purports to construe previous legislative enactments—a judicial function, giving them a meaning that contradicts a judicial decision in the matter. The latter kind of legislation

would violate Article III, section 1, but the former would not. 335 Or at 538-40.

Although the underlying issue in *McFadden* is different from the issue here, that case nevertheless provides important insight into how to analyze claims that a retroactively applicable change of law violates constitutional separation of powers principles by overturning prior judicial decisions. Under *McFadden*, a statute that simply deems valid claims that a court has already determined to be invalid is an unconstitutional exercise of a judicial function by the legislature. But sections 2 and 3 of SB 226 do not do that. That is, they do not simply set aside the Court of Appeals' determination in *De Young*, 297 Or App 530, that the quest for disincorporation under the Measure 93 election, as referred to the legislature by HB 3085 (2015), had failed because HB 3085 had not exempted the election from the requirements in ORS 221.610 and ORS 221.621. Rather, sections 2 and 3 reflect the exercise of traditional legislative functions: They provide a statutory alternative to the procedures for disincorporation elections set out in ORS 221.610 and ORS 221.621, and they make that alternative retroactively applicable. Sections 2 and 3 of SB 226 do not violate Article III, section 1, of the Oregon Constitution.[16]

## III.   CONCLUSION

Having considered petitioners' various challenges to SB 226 (2019) and the results of the disincorporation election for the City of Damascus that it purported to ratify, we hold that sections 2 and 3 of SB 226 are not unlawful under any of the theories that petitioners have presented to this

---

[16] Petitioners direct a final statutory argument specifically against sections 2 and 3 of SB 226, asserting that the use of the term "Act" in those sections means that they cannot serve to ratify the vote on Measure 93 because the enactment that led to that referral was a "bill," not an "Act." They argue that a "bill" enacted by the legislature is not an "Act" unless and until it is signed by the governor, and, because HB 3085 (2015) was never signed by the governor, Measure 93 was not an "Act" and thus does not come within the terms of SB 226. Petitioners are mistaken. Article IV, section 1(3)(c), of the Oregon Constitution provides that "[a] referendum on an *Act* may be ordered by the Legislative Assembly by law" and that such referenda "are not subject to veto by the Governor" (emphasis added)—and thus do not require the governor's signature. Under the word usage of Article IV, section 1(3)(c), Measure 93 was an "Act" and sections 2 and 3 of SB 226 properly referred to it as such.

court. Those sections accomplish the stated purpose of SB 226, which is "to cure any defect in the procedures, and to ratify the results of any vote on the question of the disincorporation of a city in which the disincorporation was approved by a majority of the voters of the city voting on the question at an election held on the date of a primary election held throughout this state before the effective date of this 2019 Act." SB 226, section 4(1). Because sections 2 and 3 of SB 226 are valid and achieve the legislature's intent, it is unnecessary to decide whether section 1 is valid, and we decline to do so.

Oregon Laws 2019, chapter 545, is declared valid.