Argued and submitted November 16, 2022, reversed and remanded
September 7, 2023

David MARKS,
*Petitioner,*

*v.*

LAND CONSERVATION AND DEVELOPMENT
COMMISSION,
City of Lake Oswego, City of Tualatin,
City of West Linn, Metro, and Clackamas County,
*Respondents.*

Land Conservation and Development Commission
A175549

536 P3d 995

Petitioner seeks judicial review of an order of the Land Conservation and Development Commission (LCDC) denying his petition for an enforcement order under ORS 197.320(12) related to two intergovernmental agreements (IGAs) entered into by various public agencies. Petitioner contends that the public agencies, through the IGAs, have unlawfully created contractual barriers to the development and urbanization of the Stafford urban reserve by delaying the adoption of concept plans. LCDC dismissed the petition, concluding that the two IGAs were not decisions that are subject to an enforcement order under ORS 197.320(12) because the IGAs did not qualify as land use decisions under the "significant impact test." *Held*: The Court of Appeals concluded that LCDC erred. The court concluded that the IGAs, which delay the completion and adoption of concept plans, are likely to have a significant impact on land use.

Reversed and remanded.

E. Michael Connors argued the cause for petitioner. Also on the briefs was Hathaway Larson LLP.

Robert M. Wilsey, Assistant Attorney General, argued the cause for respondent, Land Conservation and Development Commission. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Jeffrey G. Condit argued the cause for respondents City of Lake Oswego, City of Tualatin, and City of West Linn. Also on the brief were Jason T. Loos and Evan P. Boone and Chad A. Jacobs.

Roger A. Alfred adopted the answering brief of respondents City of Lake Oswego, City of Tualatin, and City of West Linn in its entirety for respondent Metro.

Nathan K. Boderman and Stephen L. Madkour adopted the answering brief of respondents City of Lake Oswego, City of Tualatin, and City of West Linn in its entirety for respondent Clackamas County.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagan, Judge.

SHORR, P. J.

Reversed and remanded.

**SHORR, P. J.**

Petitioner, a private landowner, seeks judicial review of an order of the Land Conservation and Development Commission (LCDC) denying his petition for an enforcement order related to two intergovernmental agreements (IGAs) entered into by various public agencies, including the cities of West Linn, Lake Oswego, and Tualatin (together, the Cities). At bottom, petitioner's contention is that the public agencies have unlawfully created contractual barriers to the development and urbanization of the urban reserve known as Stafford.

In the order on review, LCDC determined that the two IGAs were not "'decisions' that are subject to an enforcement order under ORS 197.320(12)," because the IGAs did not qualify as "land use decisions" under the "significant impact test."[1] As described further below, even if a government decision does not meet the statutory test for being a "land use decision" under ORS 197.015(10),[2] under the significant impact test, a government decision that has a "significant impact on present or future land use" is a land use

---

[1] ORS 197.320 provides:

"The Land Conservation and Development Commission shall issue an order requiring a local government, state agency or special district to take action necessary to bring its comprehensive plan, land use regulation, limited land use decisions or other land use decisions or actions into compliance with the goals, acknowledged comprehensive plan provisions, land use regulations or housing production strategy if the commission has good cause to believe:

"* * * * *

"(12) A local government within the jurisdiction of a metropolitan service district has failed to make changes to the comprehensive plan or land use regulations to comply with the regional framework plan of the district or has engaged in a pattern or practice of decision-making that violates a requirement of the regional framework plan[.]"

[2] ORS 197.015(10) provides, in part, that a "land use decision" includes:

"(A)  A final decision or determination made by a local government or special district that concerns the adoption, amendment or application of:

"(i)    The goals;

"(ii)   A comprehensive plan provision;

"(iii)  A land use regulation;

"(iv)  A new land use regulation; or

"(B)  A final decision or determination of a state agency other than the commission with respect to which the agency is required to apply the goals; or

"(C)  A decision of a county planning commission made under ORS 433.763[.]"

decision. *Billington v. Polk County*, 299 Or 471, 479-80, 703 P2d 232 (1985). Thus, in effect, LCDC's order determined that, regardless of whether the public agencies unlawfully created contractual barriers to the urbanization of Stafford, petitioner could not obtain the relief he sought from LCDC.

The first of the two IGAs at issue in this case—the "5-Party IGA"—is an agreement between the Cities, Metro,[3] and Clackamas County. The 5-Party IGA provides that no part of the Stafford urban reserve will be incorporated into Metro's Urban Growth Boundary (UGB) unless the city that will be responsible for annexing that part of Stafford develops a "concept plan" for it.[4] The 5-Party IGA further provides that the timing for completion of any concept plan for any part of Stafford will be up to the annexing city. The second IGA entered into by the Cities—the "3-Party IGA"—places a temporary moratorium on the Cities adopting concept plans for the Stafford area and on any of the Cities promoting or supporting "any expansion of the UGB into any part of Stafford."

On review before us, petitioner contends, among other points, that "LCDC erred in determining the IGAs do not qualify as land use decisions under the significant impact test."[5] Petitioner argues that the Cities have historically been opposed to the urbanization of Stafford, and the Cities having the "ability to indefinitely delay the Stafford Area from being considered for inclusion in the UGB" by delaying concept planning "will have a significant impact on future land uses in the Stafford Area." Respondents, the Cities, Metro, and Clackamas County, take the position that the "ultimate question in terms of impacts on future land uses is the decision whether the UGB will be expanded to bring in Stafford," and "that decision, under

---

[3] As explained further below, Metro is a metropolitan service district established pursuant to ORS chapter 268.

[4] Among other information, concept plans "show the general locations of any residential, commercial, industrial, institutional and public uses proposed for the area with sufficient detail to allow estimates of the cost of [certain specified] public systems and facilities." Metro Code 3.07.1110(c)(1).

[5] Petitioner also contends that LCDC "erred in interpreting ORS 197.320(12) as only applying to land use decisions." Because we conclude that the IGAs qualify as land use decisions under the significant impact test, we need not address petitioner's argument concerning the proper interpretation of ORS 197.320(12).

state law, remains with Metro" notwithstanding the IGAs. Therefore, in their view, the significant impact test is not met. Respondent LCDC argues that to have a "'significant impact' on future land uses, the impact of a decision cannot be merely 'potential,'" and petitioner's significant impact argument "contains nothing but potentialities" hinging on a "hypothetical scenario where the cities, by delaying completion of their concept plans, prevent Metro from adding the area to the urban growth boundary."

For the reasons below, we agree with petitioner that the IGAs satisfy the significant impact test and that LCDC erred in concluding that they did not. We reverse and remand.

## I.   LEGAL CONTEXT AND HISTORICAL FACTS

Before turning to the pertinent historical facts and procedural history, we provide an overview of the legal context in which this case arises, including the importance of concept planning in Metro's UGB analysis, because how Metro utilizes concept plans is central to our analysis.

### A.   *Metro, the Urban Growth Boundary, and Concept Plans*

Metro is a metropolitan service district established pursuant to ORS chapter 268 that includes land in Clackamas, Multnomah, and Washington counties. ORS 197.015(14); ORS 268.020(3). Metro is responsible for coordinating land use planning in that tri-county region. ORS 195.025; ORS 268.385. Among Metro's responsibilities is the justification, adoption, and securing of acknowledgement for the metropolitan area UGB.[6] *See generally* ORS 268.380-268.390 (describing Metro's planning and land use authority); *Sensible Transportation v. Metro. Service Dist.*, 100 Or App 564, 567, 787 P2d 498, *rev den*, 310 Or 70 (1990). The Land Use Board of Appeals (LUBA) has observed that, in assigning Metro the responsibility for justifying, adopting, and securing acknowledgment of the metropolitan area UGB, the Oregon Legislative Assembly "presumably determined

---

[6] Statewide Planning Goal 14 provides that "growth boundaries shall be established and maintained by cities, counties and regional governments to provide land for urban development needs and to identify and separate urban and urbanizable land from rural land."

adoption and administration of the metropolitan area UGB required Metro's unique regional perspective, rather than leaving adoption and administration of the UGB to the large number of cities and counties making up the metropolitan area." *Sensible Transportation*, 100 Or App at 567 (internal quotation marks omitted).

As part of its UGB-related responsibilities, Metro must conduct a review of the metropolitan area UGB every six years to ensure that it continues to maintain a 20-year supply of urbanizable land within the UGB. ORS 197.299. If Metro determines that the land supply is inadequate, it must expand the UGB or take other measures to ensure that the identified need can be accommodated. ORS 197.296(6); ORS 197.299(2).

"Urban reserves" are lands outside of a UGB that will provide for "future expansion [of the UGB] over a long-term period" and ensure "[t]he cost-effective provision of public facilities and services within the area when the lands are included within" the UGB. ORS 195.137(2). ORS 195.145(4)(b) provides for designation of urban reserves to accommodate population and employment growth for at least 20 years, and not more than 30 years, beyond the 20-year land supply accommodated within the UGB. Once designated, urban reserve lands become "first priority" for inclusion within the UGB. ORS 197.298(1)(a).

In considering where to expand the UGB, Metro's analysis must comply with, among other laws, Goal 14, which includes four "location" factors that Metro must consider when determining which urban reserve land to add to the UGB. The four location factors are "(1) [e]fficient accommodation of identified land needs; (2) [o]rderly and economic provision of public facilities and services; (3) [c]omparative environmental, energy, economic and social consequences; and (4) [c]ompatibility of the proposed urban uses with nearby agricultural and forest activities occurring on farm and forest land outside the UGB."[7]

---

[7] Goal 14 also includes two "need factors":

"(1) Demonstrated need to accommodate long range urban population, consistent with a 20-year population forecast coordinated with affected local

Although Goal 14 does not mention that the existence of a "concept plan" should play a role when determining which urban reserve land should be added to the UGB, Metro Code (MC) 3.07.1425 sets forth "factors and criteria for amendment of the UGB," which include "whether the area has been concept planned."

The requirements for the contents of "concept plans," as that term is used by Metro, are set forth at MC 3.07.1110(c). Among other information, as noted above, concept plans must "show the general locations of any residential, commercial, industrial, institutional and public uses proposed for the area with sufficient detail to allow estimates of the cost of [certain specified] public systems and facilities." *Id.* Concept plans are used to "guide, but not bind" (1) "conditions in the Metro ordinance that adds the area to the UGB" and (2) "amendments to city or county comprehensive plans or land use regulations following addition of the area to the UGB." MC 3.07.1110(d).

Under MC 3.07.1110(a), concept plans are generally required before land is added to the UGB: MC 3.07.1110(a) provides that the "county responsible for land use planning for an urban reserve and any city likely to provide governance or an urban service for the area, shall, in conjunction with Metro and appropriate service districts, develop a concept plan for the urban reserve *prior to its addition to the UGB*." (Emphasis added.) The date for completion of a concept plan and the area of urban reserves to be planned under MC 3.07.1110(a) is jointly "determined by Metro and the county and city or cities."

The Metro Code provides an exception to the general requirement that concept planning occur before land is added to the UGB. Specifically, MC 3.07.1110(e) provides:

governments, or for cities applying the simplified process under ORS chapter 197A, a 14-year forecast; and

"(2) Demonstrated need for housing, employment opportunities, livability or uses such as public facilities, streets and roads, schools, parks or open space, or any combination of the need categories in this subsection (2). In determining need, local government may specify characteristics, such as parcel size, topography or proximity, necessary for land to be suitable for an identified need. Prior to expanding an urban growth boundary, local governments shall demonstrate that needs cannot reasonably be accommodated on land already inside the urban growth boundary."

"If the local governments responsible for completion of a concept plan under this section are unable to reach agreement on a concept plan by the date set under subsection (a), then the Metro Council may nonetheless add the area to the UGB if necessary to fulfill its responsibility under ORS 197.299 to ensure the UGB has sufficient capacity to accommodate forecasted growth."

In the proceeding below, Metro explained that it added the provision in MC 3.07.1110(a) requiring concept plans prior to land being added to the UBG to "ensure[] that there is a plan for future development, including estimated costs of infrastructure and potential methods for financing," and also to "ensure[] there is a city that is willing and able to annex and govern a proposed expansion area so that it can actually be developed." The concept planning requirement in MC 3.07.1110(a) was added by Metro in the "wake of its large UGB expansion in 2002, which added approximately 12,000 acres in the Damascus area that have still mostly failed to urbanize."[8]

Additionally, in a staff report to LCDC as part of this proceeding, the Department of Land Conservation and Development (DLCD) explained that Metro cannot avoid the requirements of Goal 14 that it study all urban reserve lands for inclusion in the metropolitan UGB by using the concept planning requirements in its own code, but that it could use concept planning as a consideration under Goal 14:

"Metro cannot use the concept plan requirement [in MC 3.07.1110] to avoid the requirement of Goal 14 and OAR 660 Division 24 that it study all urban reserve lands, including the Stafford Area, for inclusion in the Metro UGB at the time of a UGB expansion analysis, and analyze such lands using the four factors for such an analysis found in Goal 14. However, Metro does have the option of using the adoption of a concept plan as a strongly determining factor in its analysis of the four UGB expansion factors in Goal 14, which emphasizes as a policy priority Metro's review under

_____

[8] In their briefing on review before us, the Cities explain that "the inability of the City of Damascus to agree on a comprehensive plan and land use regulations to urbanize ultimately resulted in its disincorporation (after multiple attempts, litigation, and legislative intervention)." (Citing *City of Damascus v. State of Oregon*, 367 Or 41, 472 P3d 741 (2020).).

the second Goal 14 location factor, 'orderly and economic provision of public facilities and services.'"

In the staff report, DLCD further explained, with regard to a recent expansion of the metropolitan area UGB, Metro gave "decisive weight" to whether a concept plan had been adopted by various cities in determining whether to add land near those cities to the UGB, and that that methodology was approved by LCDC:

> "In January 2020, [LCDC] approved a 2,100 acre Metro UGB expansion which utilized Metro's methodology. The commission found that the methodology, as applied by Metro, was consistent with Goal 14, relevant state statutes, and Metro's own code and Regional Framework Plan. Metro received four applications from cities within its boundaries (Beaverton, Hillsboro, King City, and Wilsonville) for a UGB expansion for which that city would take responsibility. All four cities submitted concept plans providing details on the proposed urban communities that would result. Metro also completed a *technically sufficient* analysis under Goal 14 of all of its urban reserve areas, \*\*\* but gave *decisive weight* to the adoption of the concept plans by these four cities as demonstrating that lands within these concept plan areas were best suited for UGB expansion."

(Emphases added.)

B.   *The Stafford Urban Reserve*

In 2010, Metro and Clackamas, Multnomah, and Washington counties adopted joint and concurrent decisions designating urban reserves under ORS 195.137 to 195.145 and OAR 660-027-0050. *Barkers Five, LLC v. LCDC*, 261 Or App 259, 275, 323 P3d 368 (2014) ("Ultimately, the designation of reserves occurs through agreements between Metro and a county.").

One such reserve was the Stafford area, which consists of approximately 6,000 acres of the approximately 23,000 acres of Metro's urban reserves—that is, the Stafford area makes up over 25 percent of Metro's urban reserves. The Stafford area contains land both to the north and south of the Tualatin river.[9]

---

[9] The Metro decision designated as urban reserve Study Area 4A (Stafford), 4B (Rosemont), 4C (Borland), and 4D (Norwood), which we refer to collectively as

After LCDC issued a final order approving Metro's decision to designate Stafford as an urban reserve, the cities of West Linn and Tualatin, who opposed the designation, were among multiple parties that sought judicial review in this court.[10] On judicial review, we concluded that LCDC's order was "unlawful in substance because LCDC has failed to demonstrate that it adequately reviewed Stafford's urban reserve designation for substantial evidence." *Barkers Five, LLC*, 261 Or App at 362. We noted that, on remand, "LCDC must demonstrate that it properly reviewed Stafford's designation as urban reserve for substantial evidence." *Id.* at 362-63.

## C.   *Remand and the 5-Party IGA*

After our remand in *Barkers Five, LLC*, the Cities, as well as Metro and Clackamas County, executed the 5-Party IGA. The recitals in the 5-Party IGA recognized that the Cities had long opposed the designation of Stafford as an urban reserve and reflect that the parties to the 5-Party IGA entered into it "in order to alleviate the concerns of the Cities and better support the designation of Stafford * * * by ensuring an orderly process for any urbanization of Stafford where the Cities will have control over the planning, process and timing for the urbanization of Stafford." In consideration for the promises and commitments made by Metro and Clackamas County in the 5-Party IGA, the Cities agreed that they would "not challenge the designation of Stafford as Urban Reserve either before the State of Oregon Land Conservation and Development Commission or by appeal to the Oregon Court of Appeals."

Substantively, the 5-Party IGA provides that the parties to it agree that "Stafford will be governed by one or more of the Cities upon expansion of the urban growth boundary and annexation"; the "governing City will have

_____

"Stafford" in this opinion. As explained by the Cities on appeal, Stafford (4A) and Rosemont (4B) are located north of the Tualatin River, adjacent to Lake Oswego and West Linn; Borland (4C) is located south of the Tualatin River and mostly north of I-205 between Tualatin and West Linn; and Norwood (4D) is located south of I-205, adjacent to Tualatin.

[10]  The City of Lake Oswego did not participate in the judicial review proceeding in *Barkers Five, LLC*, but did oppose the urbanization of Stafford. 261 Or App at 285 n 17, 357.

the authority to decide what land uses should be planned for, and when and how municipal services will be provided"; and that, "Metro and the County will oppose any future effort to incorporate a new city." The 5-Party IGA further provides that, "[p]rior to adding any part of Stafford to the UGB, the City that will be responsible for annexing that part of Stafford must first have developed a concept plan for the area describing how the area will be planned and developed after inclusion in the UGB"; that the "timing for commencement and completion of a concept plan will be up to the City"; that "each governing City will be responsible for determining the pace and timing of future development within an area to be incorporated into the UGB"; and that the parties will "participate in good faith in future planning efforts for Stafford."

Further, the 5-Party IGA provided that a $170,000 grant from Metro would be used to study and plan for transportation and other public infrastructure conditions and needs in the Stafford area, which was expected to "begin once Metro and the County have finalized the decision on urban reserves." The grant, which was originally approved in 2015, was for a "Stafford Area Preliminary Infrastructure and Feasibility Assessment" that would be the "first step in strategic planning for the Stafford area, to answer important questions before the Concept Planning is undertaken." That is, the purpose of the grant was to "inform subsequent concept planning" for the Stafford urban reserves.

The 5-Party IGA was part of the basis for the findings by Metro reapproving the designation of the Stafford area as urban reserve after our decision in *Barkers Five, LLC*. Specifically, Metro's findings in support of the designation of Stafford state:

> "The Cities of Lake Oswego, Tualatin, and West Linn have testified extensively regarding their concern that designation of Stafford as urban reserve will create pressures for urbanization before the required public facilities, particularly with regard to transportation, are planned for and can support urban development. This concern is based upon the fact that designation of Stafford as urban reserve will make it first priority for inclusion in the Metro UGB under ORS 192.298 and the fact that Metro must

consider expansion of the Metro UGB every six years under ORS 197.299. So even though the planning period for urban reserves is twenty to fifty years into the future, Stafford will become eligible for inclusion each time Metro considers an urban growth boundary expansion. To alleviate these concerns Metro, Clackamas County, and the three Cities have entered into a five-party intergovernmental agreement ('IGA') that provides for governance of Stafford by the cities, requires concept planning and public facilities planning prior to the addition of Areas 4A, 4B and/or 4C to the urban growth boundary, and a requirement for robust citizen involvement and preservation of community character pursuant to the concept planning process. This IGA, which is incorporated into the record, will ensure that Stafford 'can be developed at urban densities in a way that makes efficient use of existing and future public infrastructure investments,' 'can be served by . . . urban level public facilities and services efficiently and cost-effectively by appropriate and financially capable service providers,' and 'can be designed to preserve and enhance natural ecological systems' and 'important natural landscape features.' Acknowledging the constraints to urbanization discussed above, the existence of the IGA and the promises contained therein is necessary to support the determination by Metro and Clackamas County that the designation of Stafford Areas 4A, 4B and 4C as urban reserve is, on balance, supportable under the urban reserve factors contained in ORS 195.145(5) and OAR 660-027-0050."

On May 16, 2018, LCDC acknowledged Metro's designation of Stafford as an urban reserve.

D. *The 3-Party IGA*

In February 2019, after LCDC had acknowledged Metro's designation of Stafford as an urban reserve, the Cities entered into the 3-Party IGA. The recitals to the 3-Party IGA reflect the view that the 3-Party IGA "implements the Five-Party IGA and, therefore, is necessary to support the determination by Metro and Clackamas County that the designation of Stafford as an urban reserve is supportable under the urban reserve factors contained in ORS 195.145(5) and OAR 660-027-0050."

As relevant to the issues on review, substantively, the 3-Party IGA provides that the Cities amongst

themselves agree that a "key piece of infrastructure that must be planned for and funded before the parties can complete meaningful concept planning is the widening of Interstate 205 to three lanes in each direction from Oregon City to Stafford Road and the replacement or reconstruction of the Abernethy Bridge ('I-205 Widening Project')," which "will have to be a regional project funded by state and federal funds." Therefore, the Cities agreed that

> "no Party will complete or adopt any concept plan for any part of Stafford under Title 11 of the Metro Urban Growth Management Functional Plan \* \* \*, or that otherwise constitutes a concept plan under the terms of the Five-Party Agreement, or that otherwise constitutes a criterion for UGB expansion, nor will any Party apply for, promote or support any expansion of the UGB into any part of Stafford, until[:]

> "1.3.**1 South of Tualatin Rive**r. For any concept plan proposal involving a portion of Stafford that is south of the Tualatin River:

> "(a) The I-205 Widening Project has received preliminary design approval; and

> "(b) Funds to construct the I-205 Widening Project have been identified and appropriated; and

> "(c) Construction of the I-205 Widening Project is scheduled to begin in two years or less.

> "1.3.2 North of the Tualatin River. For any concept plan proposal involving any portion of Stafford that is north of the Tualatin River, the later of:

> "(a) December 31, 2028; or

> "(b) until all the conditions in subsections 1.3.1 (a), (b) and (c) are met."

(Boldface in original.)

Additionally, the 3-Party IGA provides concept planning criteria in addition to those in the Metro Code. It provides that

> "In addition to concept planning criteria under Metro Code Section 3.07.1100, \* \* \* the Parties agree that the following criteria will apply to Stafford area concept plans:

"(a) Consider community character;

"(b) Provide separation between communities and understandable borders;

"(c) Preserve natural features;

"(d) Maintain functionality of transportation and other systems. Unless mitigated and addressed as provided in Section 2.2, no material impairment or degradation of the functionality of a transportation or utility facility or system of another Party."

Following entry into the 3-Party IGA—which, as noted, delayed completion or adoption of concept plans for the Stafford area north of the Tualatin river until December 31, 2028, at the earliest—Metro sent a letter to the Cities stating that the 3-Party IGA "calls into question the continued relevance of the 2015 grant award, which was specifically intended to assess the demands that urban growth in Stafford would place on currently existing infrastructure in order to inform concept planning" and that Metro would not fund the grant so as to not spend "public funds on a study that is likely to no longer be relevant if and when concept planning for Stafford does occur." The letter encouraged the Cities to pursue a new grant in the future, "perhaps with a broader scope that more accurately reflects the current agreement regarding how and when planning for Stafford will proceed."

E.   *The Enforcement Proceeding*

On February 6, 2020, petitioner, who owns property in the Stafford area and is "concerned that the Cities are improperly preventing the Stafford Area from being included in the UGB," filed a petition for an enforcement order pursuant to ORS 197.320(12). The petition alleged that Metro, Clackamas County, and the Cities had engaged in a pattern or practice of decision-making that violates the requirements of Metro's Regional Framework Plan (RFP) with respect to the concept planning process for the Stafford Area.[11] ORS 197.320 provides:

---

[11] "A regional framework plan is essentially a master plan that incorporates and coordinates Metro's various functional plans." *1000 Friends of Oregon v. Metro*, 174 Or App 406, 419 n 10, 26 P3d 151 (2001) (internal quotation marks omitted).

"The Land Conservation and Development Commission shall issue an order requiring a local government, state agency or special district to take action necessary to bring its comprehensive plan, land use regulation, limited land use decisions or other land use decisions or actions into compliance with the goals, acknowledged comprehensive plan provisions, land use regulations or housing production strategy if the commission has good cause to believe:

"* * * * *

"(12) A local government within the jurisdiction of a metropolitan service district has failed to make changes to the comprehensive plan or land use regulations to comply with the regional framework plan of the district or has engaged in a pattern or practice of decision-making that violates a requirement of the regional framework plan[.]"

Petitioner requested that LCDC adopt an Enforcement Order requiring the Metro, Clackamas County, and the Cities to (1) "nullify and invalidate" the 3-Party IGA and (2) amend and clarify the 5-Party IGA "to ensure that the concept planning process for the Stafford Area will be implemented in a manner consistent with the applicable statutes, administrative rules and MC Chapter 3.07, Title 11."

On May 27, 2020, LCDC found good cause to proceed to a contested-case hearing to determine whether the IGAs constitute a pattern or practice of decision-making that violates Metro's Regional Framework Plan under ORS 197.320(12). LCDC asked the hearings officer to address four legal questions, only one of which is central to our analysis: whether the IGAs are "decisions" subject to an enforcement action under ORS 197.320(12).

The hearings officer concluded that they were, reasoning:

"the IGAs are decisions that are subject to ORS 197.320(12) only if they are land use decisions. The IGAs are not statutory land use decisions [under ORS 197.015], but they are significant impacts test land use decisions. Therefore, the IGAs are decisions that are subject to ORS 197.320(12)."

Specifically, in concluding that the IGAs were "significant impacts test land use decisions," the hearings officer reasoned:

"The Stafford Area is a very large area. The Stafford Area contains over 25% of the current urban reserves. If the Stafford Area is not added to the UGB then other areas will have to be added. There are no other urban reserves near the Cities, so if the Stafford Area is not urbanized there would likely be little to no urbanization near the Cities. Whether or not properties in the Stafford Area will be able to add housing and/or other urban uses would have a significant impact on the use of those properties. Whether or not the Stafford Area is urbanized will in my opinion have very significant impacts. That is the one of the reasons there is so much controversy and litigation over the issue."

The hearings officer also rejected an argument by the Cities that the IGAs were not land use decisions under the significant impacts test because "the impacts of the IGAs on land uses are only speculative." The hearings officer reasoned:

"[T]o qualify as a significant impacts land use decision the decision must have a certain versus potential impact and have a significant impact rather than merely some impact. Granting the Cities unilateral authority to determine the process for bringing the area into the UGB is more than a potential impact. While there is no guarantee that the Stafford Area would be brought into the UGB in the next ten years, preventing the Stafford Area from even being considered would have cascading effects on other areas to be considered and the availability of housing for the Cities. *** In the present case, I think the future impacts would certainly be significant rather than merely some impact."

(Footnote omitted.)

Having determined that the significant impact test rendered the 5-Party IGA and the 3-Party IGA land use decisions, the hearings officer considered the merits of petitioner's case and determined that petitioner had not proven his case, because neither the 5-Party IGA nor the 3-Party IGA violate the RFP.

In LCDC's order from which petitioner now seeks judicial review, LCDC noted that the hearings officer had identified "no disputed facts necessary to resolve this matter," and that in its view the issues presented were "legal questions." It agreed with the hearings officer that the IGAs are decisions that are subject to ORS 197.320(12) only if they are land use decisions, but did not "adopt the recommended conclusion of law or reasoning of the Hearings Officer that the IGAs are significant impact test land use decisions." LCDC noted that "for an action to be a significant impact test land use decision":

> "'the decision must create an actual, qualitatively or quantitatively significant impact on present or future land uses. Further, the expected impacts must be likely to occur as a result of the decision, and not simply speculative.'"

(Quoting *Carlson v. City of Dunes City*, 28 Or LUBA 411, 414 (1994).)

LCDC then concluded that "the IGAs are not [significant impact test] land use decisions because the IGAs do not 'create an actual, qualitatively or quantitatively significant impact on present or future land uses.'" LCDC explained:

> "First, the IGAs make no change to the area's land use designation. The Stafford Area is an acknowledged urban reserve area designated under ORS 195.145 and thus is the first priority of land for inclusion within the Metro regional urban growth boundary. ORS 197.298(1)(a); OAR 660-027-0070(1). Present land uses are regulated by the Commission's rules ***; thus, those rules, not either IGA control present land uses of the Stafford Area. Second, the Hearings Officer determined that the IGAs do not violate the RFP provisions that govern the planning for future uses of the Stafford Area. As such, the Commission concludes that the IGAs do not create an actual, qualitatively or quantitatively significant impact on future land uses."

Regarding future land use, LCDC further explained:

> "The Commission disagrees that the IGAs determine 'whether or not the Stafford Area is urbanized' and concludes that the IGAs do not create an actual, qualitatively or quantitatively significant impact on future land uses.

The future urbanization of the Stafford Area must comply with state law. By way of short synopsis, state law requires Metro to identify and accommodate its need for housing, employment opportunities, and livability within the regional urban growth boundary. Goal 14; ORS 197.296. If the identified need cannot reasonably be accommodated on land already inside the regional urban growth boundary, Metro must determine which land to add by evaluating alternative urban growth boundary locations consistent with the priority of land specified in ORS 197.298 and the boundary location factors of Goal 14. OAR 660-024-0060(1). As noted above, because the Stafford Area is an acknowledged urban reserve area it is among the first priority of land for inclusion within the Metro regional urban growth boundary. ORS 197.298(1)(a); OAR 660-027-0070(1). As such, Metro must consider and balance the boundary location factors of Goal 14 for the Stafford Area urban reserves for comparison to other urban reserves in the alternative boundary locations and ultimately to determine the Metro UGB location. OAR 660-024-0060(3).

"Nothing in the IGAs prohibits Metro from including the Stafford Area in the required boundary location analysis, nor could either IGAs lawfully do so. If Metro determined that inclusion of all or part of the Stafford Area is necessary to fulfill its responsibility under ORS 197.299, the Commission understands Metro to have retained that authority under the Regional Framework Plan. *See* MC 3.07.1110(e) (Metro may add an area to the regional urban growth boundary absent a concept plan to satisfy state law requirements).

"At most, the Commission concludes that the IGAs demonstrate coordination on a preferred timing for future urban land uses. Metro ultimately has responsibility under state law to coordinate, evaluate urban reserves for consideration, and under the Regional Framework Plan to move ahead in the absence of a concept plan if necessary to fulfill its obligations under state law. Metro has statutory power to require cities and counties to change their plans to conform to Metro's plans. ORS 268.380; ORS 268.390; *Citizens for Better Transit v. Metro Service Dist.*, 15 Or LUBA 482, 487 (1987). Thus, the Commission does not find that [petitioner] has established that the IGAs are significant impact land use decisions. *** [T]he Commission concludes that based on the foregoing discussion, it is evident

that the IGAs do not significantly impact present or future land uses because such actual uses are determined under existing state law, regardless of the IGAs. Therefore, the Commission determines that the 3-Party and 5-Party IGAs are not 'decisions' that are subject to an enforcement order under ORS 197.320(12)."

Thus, LCDC concluded that because state law governs land use in the Stafford area, the IGAs could not have a significant impact. And, having determined that the IGAs did not meet the significant impact test, LCDC declined to address whether the IGAs constitute a "series of decisions" that in turn constitute a "pattern or practice" of decision making, whether "Metro and Clackamas County [are] considered parties to a 'series of decisions' that constitute a 'pattern or practice' of decision-making pursuant to ORS 197.320(12)," and whether the "3-Party IGA violates a provision of Metro's Functional Plan."

Petitioner now seeks judicial review of LCDC's order, contending that "LCDC erred in determining the IGAs do not qualify as land use decisions under the significant impact test." We agree with petitioner.

## II.  STANDARD OF REVIEW

Judicial review of the order in this case is governed by ORS 197.335(2), which provides, in pertinent part,

"Upon review, an appellate court may affirm, reverse, modify or remand the order. The court shall reverse, modify or remand the order only if it finds:

"(a)  The order to be unlawful in substance or procedure, but an error in procedure is not cause for reversal, modification or remand unless the court finds that substantial rights of any party were prejudiced thereby[.]"

The "unlawful in substance" review standard is for "a mistaken interpretation of the applicable law." *Mountain West Investment Corp. v. City of Silverton*, 175 Or App 556, 559, 30 P3d 420 (2001); *see also Dimone v. City of Hillsboro*, 182 Or App 1, 6 n 5, 47 P3d 529 (2002) (noting the "unlawful in substance" standard "is the functional equivalent of the 'erroneously interpreted a provision of law' standard in ORS

183.482(8)(a) that is applicable to our review of an order in a contested case issued by a state administrative agency").

## III.   ANALYSIS

We begin our analysis by summarizing the "significant impact test" for determining when a decision that does not meet the statutory test for being a "land use decision" under ORS 197.015(10) is nevertheless a land use decision. We then turn to summarizing the parties' arguments and explaining why we believe LCDC erred in determining that the IGAs were not subject to an enforcement proceeding under ORS 197.320(12).

### A.   *The Significant Impact Test*

In Oregon, "there are two tests to determine whether a decision is a land use decision: (1) The statutory test defined by ORS 197.015(10), and (2) The significant impact test * * * for decisions not expressly covered in a land use norm." *Billington*, 299 Or at 479. The "significant impact test" was "devised to supplement the legislative grant of jurisdiction * * *, by making some land use actions reviewable that do not meet the statutory definition of a 'land use decision.'" *Oregonians in Action v. LCDC*, 103 Or App 35, 38, 795 P2d 1098 (1990). "The significant impact test is a determinant of jurisdiction, not of the merits of a review."[12] *Wagner v. Marion County*, 79 Or App 233, 236, 719 P2d 31, *rev den*, 302 Or 86 (1986).

The significant impact test is deceptively easy to articulate: A decision which has a "significant impact on present or future land use" satisfies the test and is a land use decision. *See*, *e.g.*, *Hemstreet v. Seaside Improvement Commission*, 93 Or App 73, 75, 761 P2d 533 (1988) (articulating significant impact test). Thus, by its terms, the test is not satisfied where a decision merely "would have potential impact," "would affect," or "would have any impact" on current or future land uses. *Billington*, 299 Or at 479 ("In this case, the test that should have been used is the significant impact test rather than 'would have potential impact,' 'would affect' or 'would have any impact' on current or future

---

[12] Of course, "[t]he evaluation of the threshold element needed for jurisdiction may overlap petitioner's claim on the merits." *Billington*, 299 Or at 479.

land uses."). Further, as articulated by LUBA, under the significant impact test, the "expected impacts must be *likely* to occur as a result of the decision, not speculative." *Phillips v. Polk County*, ___ Or LUBA ___, ___ (LUBA No 2023-014, Apr 2023) (emphasis added). Although LUBA decisions are not binding on this court, we agree with that articulation by LUBA.

Notwithstanding the seeming ease with which the significant impact test can be articulated, it is a "'nebulous standard.'" *Billington*, 299 Or at 478 (quoting *City of Pendleton v. Kerns*, 294 Or 126, 133, 653 P2d 992 (1982)). As noted in *Kerns*, "[w]hereas some decisions, such as to resurface a street or repair potholes, have only a *de minimis* impact on land use, and some, such as to construct a major arterial road or a bridge, have a substantial impact, a large number of a city's day-to-day decisions regarding public works and roads fall in between." *Kerns*, 294 Or at 133.

By way of background for our analysis, we begin with an explanation of how the significant impact test has been applied historically.

In *Kerns*, one of the first cases involving the significant impact test, the Supreme Court recognized that a decision that "effects a significant change in the land use *status quo* of the area" meets the significant impact test. 294 Or at 135. There, the court upheld LUBA's determination that it had jurisdiction to review a city ordinance that authorized the improvement of an already dedicated but unimproved city street. *Id.* at 128. The street was designated in the city's comprehensive plan as a minor neighborhood street, and the city's decision would have opened the street as a major access route to two large undeveloped subdivisions. *Id.* The court concluded that the ordinance did not contemplate merely a "*de minimis* street improvement project" but would "effect[] a significant change in the land use *status quo*" and was therefore reviewable by LUBA. *Id.* at 135; *see also Harding v. Clackamas County*, 89 Or App 385, 387, 750 P2d 167 (1988) (LUBA did not err in concluding that vacating portion of improved county road was subject to LUBA review because it had a significant impact on present or future land uses in the area based on LUBA's finding that vacating the

road "alters the existing traffic pattern of nearby property owners having a right of access to the street").

Subsequent to *Kerns*, our case law made clear that, at least in some instances, a decision *not to* change the use of land can have a significant impact. In *1000 Friends of Ore. v. Wasco Co. Court*, 62 Or App 75, 77, 659 P2d 1001, *rev den*, 295 Or 259 (1983) (*Wasco County I*), relying on the Supreme Court's analysis in *Kerns*, we reversed and remanded an order in which LUBA determined that it lacked jurisdiction over an order of the Wasco County Court granting a petition for incorporation of the City of Rajneeshpuram, fixing boundaries of the proposed city, and setting a date for a special election on the matter of incorporation. We determined that "the county's decision to authorize an incorporation election is a land use decision subject to LUBA review" because "[i]mplementation of the county's decision is the election to incorporate, to set urban boundaries and to effect a transition from rural to urban land use," which would "have a significant impact if, as appears reasonably possible, the voters elect to incorporate: land that could not before have been used for urban use would be available for future urban use." *Id.* at 81-82. We also observed, however, that "[i]f the voters defeat incorporation, no land will be available for urban use," and although that would "maintain the *status quo*, it would nevertheless have significant impact on future uses and planning activities."[13] *Id.* at 82 n 7.

---

[13] After our remand in *Wasco County I*, in a subsequent judicial review proceeding, the Supreme Court determined that incorporation of a new city is a "land use decision" under ORS 197.015(10). *See 1000 Friends of Oregon v. Wasco County Court*, 299 Or 344, 348, 703 P2d 207 (1985) (*Wasco County II*). In doing so, the court also concluded that a county approval of an incorporation petition has a "significant impact on present or future land use" under the standard set forth in *Kerns*:

"Under the express terms of ORS 221.040(3), once a county approves the incorporation petition, the county 'shall make an order fixing a date for a special election relating to the incorporation of the proposed city.' At that point, the process passes out of the county's control and into the hands of the electorate. Therefore, the 'final' decision by the county concerning the applicable goals, the *only* decision by the county concerning the creation of a new city which has a 'significant impact on present or future land use,' *see City of Pendleton v. Kerns*, 294 Or 126, 134-35, 653 P2d 992, 996 (1982), occurs when the county approves the petition and authorizes the election."

*Wasco County II*, 299 Or at 359 (emphasis in original).

Then, in *Wagner*, we were expressly confronted with the question of how to apply the significant impact test in the face of a government body's decision "not to change an existing situation." 79 Or App at 236. In that case, the county approved two partitioning requests and as part of the resolutions approving the partitions, the county restricted access to a public road from the divided parcels. *Id.* at 235. Eight years later, the petitioner conveyed five acres of land within the area subject to the access restriction and requested a "lot line adjustment" from the county. *Id.* As part of that request, the petitioner sought permission from the county for the buyer of the parcel to use the public road. *Id.* The county granted the lot line adjustment but denied the request for road access. *Id.* LUBA concluded that the county's action did not have a "significant impact on present or future land uses" in the area and that it therefore did not qualify as a "land use decision," explaining:

"In this appeal, we have considerable difficulty applying the significant impact test. As we construe the decision, the county refused to waive or rescind previously adopted orders. This has the effect of maintaining the *status quo*. The significant impact test does not appear to contemplate a situation in which the *status quo* is maintained by rejection of a proposal to waive or rescind a prior order.

"Even if the significant impact test could be applied to the circumstances here, we believe petitioners have not demonstrated that the test is met. As noted, the decision maintains, rather than alters the *status quo* in this area. The petition does not demonstrate why the county's refusal to allow requested access will have a significant impact on present or future land use in the area."

*Id.* (emphases in original; internal quotation marks omitted).

We stated that, although we shared LUBA's view that the "'significant impact test' is difficult to apply here," we did "not agree that the perpetuation of the restriction *necessarily* perpetuates the *status quo* because at least one other factor has changed since the access restriction was

---

In view of the Supreme Court's holding in *Wasco County II*, we note that our jurisdictional holding in *Wasco County I* was based on the "significant impact test" rather than on the "land use decision" statutory test of ORS 197.015(10). *Sensible Transportation*, 100 Or App at 570 n 5 (so stating).

established"—*viz.*, "[a]fter the county imposed the restriction, it rezoned the area from low density residential to an exclusive farm use designation." *Id.* at 235-36 (emphases in original). We went on to hold that, although we were not answering the jurisdictional question, "LUBA's decisional premise, that a decision *not* to change an existing situation cannot have a significant impact, no matter what related changes have occurred since the situation came into being, is not a satisfactory basis for answering the question." *Id.* at 236 (emphasis in original).

Nevertheless, it is also clear from case law that a mere "proposed" change to land use that is contingent on future events does not satisfy the significant impact test. In *Hemstreet*, we affirmed a LUBA order dismissing for lack of jurisdiction an appeal from a decision of the Seaside Improvement Commission—the governing body of a renewal district—accepting the respondent's proposal rather than petitioner's competing proposals to lease the air space over certain property owned by the district. 93 Or App at 75. The decision stated, "*Motion* to accept [respondents' proposal], based on further details to be agreed upon by the attorneys and Administrative Officer, and subject to the approval of the Improvement Commission; carried." *Id.* at 75 (emphasis in original). On review, we agreed with LUBA that the decision had "no more than a potential impact on future land use and that it therefore does not come within the significant impact test." *Id.* at 75-76. We explained that that was so because the decision was "contingent with respect to the eventual use of the space as it is with respect to the award of the lease." *Id.* at 76.

Similarly, in *Crist v. City of Beaverton*, 143 Or App 79, 922 P2d 1253 (1996), we affirmed LUBA's determination that it lacked jurisdiction over an appeal concerning a "preannexation agreement" relating to property in unincorporated Washington County, where respondent sought to locate and operate a planned unit development. We concluded that the preannexation agreement was not a significant impact land use decision, because the agreement "merely says that something will be done, if the conditions precedent for it are satisfied." *Id.* at 83; *see also Sensible Transportation*, 100

Or App at 566, 570 n 5 (holding that an update to Metro's functional regional transportation plan recommending Washington County conduct "appropriate studies and consider whether to amend its comprehensive plan to provide for the construction of a 'Western Bypass' freeway corridor" was "inconsistent with LUBA's having jurisdiction under the significant impact test" due to the "totally contingent nature of the update").

B.   *The Parties' Arguments*

With that understanding of the significant impact test, we turn to the parties' arguments. As noted above, petitioner contends that "LCDC erred in determining the IGAs do not qualify as land use decisions under the significant impact test." In support of that contention, petitioner argues that LCDC erred in concluding that "Metro retained its authority to add the Stafford Area to the UGB under MC 3.07.1110(e)" and that since "LCDC wrongly assumed Metro retained the authority to add the Stafford Area to the UGB under MC 3.07.1110(e), LCDC clearly did not consider the full impact of the IGAs on future land use." As petitioner sees it, had LCDC "properly evaluated the impact of the IGAs on future land uses in the Stafford Area, there is no question it would have concluded they satisfy the significant impact test." Petitioner also argues that under *Wagner*, 79 Or App at 236, "a decision to maintain the *status quo* or not change an existing situation can qualify under the significant impact test."

More specifically, regarding the Stafford Area itself, petitioner posits that, because "[u]rban uses will not be allowed in the Stafford Area until it is incorporated into the UGB," the "Cities' ability to indefinitely delay the Stafford Area from being considered for inclusion in the UGB will have a significant impact on future land uses in the Stafford Area." Additionally, regarding the Metro region as a whole, petitioner argues that "if the Cities are allowed to prevent the inclusion of the largest and most viable urban reserve area in the UGB, Metro will be forced to address regional housing needs by expanding the UGB in other areas that

are less suited for urbanized development or will not address the areas that need it the most."

In response, the Cities contend, among other points, that they have no "legal authority to change or effect land uses in Stafford until the area is added to the UGB and annexed to one of the cities," and therefore, the IGAs could not have a significant impact on land use. As the Cities see it, "the ultimate question in terms of impacts on future land uses is the decision whether the UGB will be expanded to bring in Stafford," and "under state law, that decision remains with Metro" regardless of anything in the IGAs. That is, according to the Cities, if "additional UGB land is needed, and if after comparing Stafford with other urban reserve lands it is determined that including Stafford within the UGB is needed under ORS 197.299," Metro could do so. The Cities further argue that the 3-Party IGA is merely "the Cities coordinating *among themselves* \* \* \* the earliest date when they would adopt concept planning" and those dates are "well within the timing and coordination provisions of the 5-Party IGA." (Emphasis in original.)[14]

LCDC, for its part, asserts that the IGAs do not effect "a significant change in the land use *status quo* of the Stafford Area, because, as LCDC correctly observed, that *status quo* is governed by the state law," and Metro "has the authority under the Regional Framework Plan to move ahead in the absence of a concept plan if necessary to fulfill its obligations under state law." Thus, LCDC contends the IGAs are "akin to the pre-annexation agreement" in *Crist* because the IGAs "do nothing; they merely say that something will be done, if the conditions are satisfied." (Brackets, emphases, and internal quotation marks omitted.) Further, as LCDC sees it, under *Hemstreet*, to have a "'significant impact' on future land uses the impact of a decision cannot be merely 'potential,'" and petitioner's significant impact argument "contains nothing but potentialities" hinging on a "hypothetical scenario where the cities, by delaying completion of their concept plans, prevent Metro from adding the area to the urban growth boundary."

---

[14] On appeal, pursuant to ORAP 5.77(4), Clackamas County and Metro adopted the Cities' brief.

C.   *The IGAs Satisfy the Significant Impact Test*

We conclude that the IGAs satisfy the significant impact test and are "land use decision" subject to review under ORS 197.320.

Regarding the 3-Party IGA, to start, for the area north of the Tualatin river, the 3-Party IGA prohibits the Cities from completing or adopting a concept plan until at the earliest December 31, 2028—nearly 10 years after the 3-Party IGA was entered into—and potentially far longer, depending on when certain criteria are met concerning the status of the "I-205 Widening Project," which is something no party to the 3-Party IGA has direct control over. The 3-Party IGA further prevents any of the Cities from "promot[ing] or support[ing] *any* expansion of the UGB into *any* part of Stafford," notwithstanding that the 5-Party IGA designates the Cities as the parties with "control over the planning, process and timing for the urbanization of Stafford." (Emphases added.)

As discussed above, Metro has previously given "decisive weight to the adoption of the concept plans" by cities as demonstrating that lands "within these concept plan areas were best suited for UGB expansion." Thus, the decision to prohibit the completion or adoption of concept plans in Stafford (particularly coupled with the Cities' agreement amongst themselves not to promote or support any expansion of the UGB into any part of Stafford) is, in sum and substance, a decision "not to change an existing situation." *Wagner*, 79 Or App at 236. That is, it is a decision to keep Stafford, at least that part north of the Tualatin river, outside of the UGB and unavailable for urban uses for a least 10 years and potentially much longer. It is a decision not to move forward with the steps necessary for the urbanization and eventual annexation of Stafford. *Cf. Petersen v. Klamath Falls*, 279 Or 249, 253, 566 P2d 1193 (1977) ("Annexation decisions are inextricably involved with intermediate and long-term land use objectives, for such decisions will control the future growth and development of our urban areas."). Indeed, it was the provisions of the 3-Party IGA that were the stated reason for Metro deciding not to fund the $170,000 grant, the purpose of which was to "assess the demands that

urban growth in Stafford would place on currently exist-
ing infrastructure in order to inform concept planning."
Moreover, as in *Wagner*, the decision not to change an exist-
ing situation in this case arises in the face of changed cir-
cumstances: In *Wagner*, it was the rezoning "of an area from
low density residential to an exclusive farm use designa-
tion," 79 Or App 236; here, with regard to the 3-Party IGA,
it was Stafford's designation as an urban reserve land (*i.e.*,
land that has "first priority" for inclusion within the UGB,
ORS 197.298(1)(a)).

     We agree with the hearings officer that "[w]hether
or not the Stafford Area is urbanized will *** have very sig-
nificant impacts" on properties in the Stafford area and fail-
ure to concept plan for urbanization would have "cascading
effects" on other areas to be considered and the availability
of housing for the Cities. As the hearings officer found:

> "The Stafford Area is a very large area. The Stafford Area
> contains over 25% of the current urban reserves. If the
> Stafford Area is not added to the UGB then other areas will
> have to be added. There are no other urban reserves near
> the Cities, so if the Stafford Area is not urbanized there
> would likely be little to no urbanization near the Cities."

     For that reason, we conclude that the decision to
delay the completion or adoption of concept plans is likely to
have a significant impact on land use in the Stafford urban
reserve, and we conclude that the 3-Party IGA satisfies the
significant impact test.

     In reaching the conclusion that the 3-Party IGA
satisfies the significant impact test, we have also considered
that the 3-Party IGA mandates certain concept planning
criteria in addition to those in the Metro Code, including
"providing separation between communities and under-
standable borders," "preserv[ing] natural features," and
"[u]nless mitigated and addressed *** no material impair-
ment or degradation of the functionality of a transportation
or utility facility or system of another Party." In our view,
those requirements for concept planning in Stafford—which
are in addition to those mandated by Metro, and which will,
as noted, "guide" (1) "conditions in the Metro ordinance that
adds the area to the UGB" and (2) "amendments to city or

county comprehensive plans or land use regulations following addition of the area to the UGB," MC 3.07.1110(d)—also militate toward a conclusion that the 3-Party IGA satisfies the significant impact test.

Regarding the 5-Party IGA, as noted, in that agreement, Metro, Clackamas County, and the Cities agreed that "each governing City will be responsible for determining the pace and timing of future development within an area to be incorporated into the UGB," that "[p]rior to adding any part of Stafford to the UGB, the City that will be responsible for annexing that part of Stafford must first have developed a concept plan for the area describing how the area will be planned and developed after inclusion in the UGB," and that the "timing for commencement and completion of a concept plan will be up to the City." Those agreements by Metro and Clackamas County stand in contrast to the normal process under MC 3.07.1110(a), which provides that the date for completion of a "concept plan and the area of urban reserves to be planned will be *jointly determined* by Metro and the county and city or cities," and MC 3.07.1110(e), which provides for Metro to "add the area to the UGB if necessary to fulfill its responsibility under ORS 197.299 to ensure the UGB has sufficient capacity to accommodate forecasted growth" in the absence of a concept plan if "the local governments responsible for completion of a concept plan under this section are unable to reach agreement on a concept plan by the date set under subsection [MC 3.07.1110(a)]." Thus, as we understand it, it is the 5-Party IGA that paved the way for the Cities entering into the 3-Party IGA; indeed, the 3-Party IGA itself states that it is intended to "implement" the 5-Party IGA.

It follows from our conclusion that the 3-Party IGA satisfies the significant impact test that the 5-Party IGA— which the 3-Party IGA is intended to implement, and which provides that the Cities alone will have control over the timing of concept planning—is also likely to have a significant impact on land use.

The primary difficulty with LCDC's analysis is its assumption that, because "Metro must consider and balance the boundary location factors of Goal 14 for the Stafford Area

urban reserves for comparison to other urban reserves in the alternative boundary locations and ultimately to determine the Metro UGB location," and because, in its view, Metro retained that authority under the IGAs, the IGAs therefore could not "significantly impact present or future land uses because such actual uses are determined under existing state law." The difficulty with that analysis is that, as explained above, although "Metro cannot use the concept plan requirement [in MC 3.07.1110] to avoid the requirement of Goal 14 that it study all urban reserve lands, including the Stafford Area, for inclusion in the Metro UGB at the time of a UGB expansion analysis, and analyze such lands using the four factors for such an analysis found in Goal 14," Metro has "the option of using the adoption of a concept plan as a strongly determining factor in its analysis of the four UGB expansion factors in Goal 14, which emphasizes as a policy priority Metro's review under the second Goal 14 location factor, 'orderly and economic provision of public facilities and services.'" And, as noted, Metro in fact has given the adoption of concept plans "decisive weight" in determining what lands are "best suited for UGB expansion."

As explained above, Metro prioritizes concept planned land for incorporation into the UGB because, in Metro's view, concept planning "ensures that there is a plan for future development, including estimated costs of infrastructure and potential methods for financing," and also "ensures there is a city that is willing and able to annex and govern a proposed expansion area so that it can actually be developed." The concept planning requirement in the Metro Code came about in the "wake of [Metro's] large UGB expansion in 2002, which added approximately 12,000 acres in the Damascus area that have still mostly failed to urbanize." We have no reason or occasion here to question Metro's choice regarding the prioritization of concept planned land when adding land to the UGB, but LCDC's analysis failed to take that choice into account.[15]

_____

[15] We note that, on review before us, petitioner argues that it is "undisputed that Metro will not be able to consider the Stafford Area during its next review of the UGB in 2024, because the IGAs prohibit the adoption of concept plans until at least December 31, 2028." We do not understand that to be undisputed. LCDC argues that its decision below was correct because it is Metro that "ultimately has responsibility under state law to coordinate, evaluate urban reserves

Put simply, the difficulty with LCDC's analysis is that even if Metro is able to add parts of Stafford to the UGB without concept plans under MC 3.07.1110(e) and without the Cities' support if needed to comply with its obligations under state law, in determining where to expand the UGB, Metro prioritizes land that has been concept planned.

Additionally, we are not persuaded by LCDC's comparisons between the IGAs, on the one hand, and governmental decisions in *Crist* and *Hemstreet*, on the other. Unlike the preannexation agreement in *Crist*, which "merely sa[id] that something will be done, if the conditions precedent for it are satisfied," 143 Or App at 83, the 5-Party IGA and the subsequent 3-Party IGA did something: They designated the Cities as the parties that would control the timing of the adoption of concept plans, prohibited the Cities from adopting concept plans for areas north of the Tualatin river for a period of 10 years, and adopted new criteria for concept planning. Further, unlike the governing body decision in *Hemstreet*, which awarded a lease contingent on "further details to be agreed upon by the attorneys and Administrative Officer, and subject to the approval of the Improvement Commission," 93 Or App at 75, the decision not to adopt concept plans for Stafford contains no such contingency.

Finally, we note that, on review, petitioner and respondents do not see eye-to-eye as to another aspect of LCDC's decision. Petitioner argues that "LCDC erred by concluding the IGAs do not impact future land uses based on the hearings officer's determination the IGAs do not violate the RFP," while the Cities respond that LCDC did not base its "'significant impacts' decision on the hearing officer's

---

for consideration, and * * * to move ahead in the absence of a concept plan if necessary to fulfill its obligations under state law."

Although petitioner's argument overstates his case because, as noted, Metro cannot use the concept plan requirement in MC 3.07.1110 "to avoid the requirement of Goal 14 and OAR 660 Division 24 that it study all urban reserve lands, including the Stafford Area, for inclusion in the Metro UGB at the time of a UGB expansion analysis," as a practical matter, given the importance of concept planning to Metro's analysis, petitioner's point is made. And, as petitioner also notes, even if Metro has the authority to add part of Stafford to the UGB without a concept plan, "Metro clearly stated it will not do so and agreed to the 5-Party IGA to convince the Cities of this fact."

determination that the IGAs do not violate the RFP" and petitioner is "inappropriately attempt[ing] to bootstrap his argument on the merits of that question into this appeal." We do not see that issue as having any bearing on our jurisdictional analysis given the facts of this case; as noted, a decision can be compliant with the law and still have a significant impact on land use. *Wagner*, 79 Or App at 236 ("The significant impact test is a determinant of jurisdiction, not of the merits of a review.").

## IV.   CONCLUSION

On the first page of his opinion, the hearings officer in this case noted that there is a "long convoluted history involving the Stafford Area and its potential inclusion in the urban reserve and urban growth boundary." This case is another chapter in that history. Although there is no guarantee that, without the IGAs, urbanization of Stafford would move forward more quickly, we nevertheless conclude that the IGAs are likely to have a significant impact on land use in Stafford and the surrounding area within the meaning of the significant impact test. Consequently, we reverse and remand this case to LCDC for further consideration consistent with this opinion.

Reversed and remanded.